## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

DAVID REEVES, BILLIE REEVES,
ANASTASIOS PLEVRAKIS,
ALLISON PLEVRAKIS, AMPHON JOHNSON,
and ALFREINO JOHNSON, individually and
on behalf of all others similarly situated,

                 Plaintiffs,                               CASE NO: 6:13-cv-597-GKS-TBS

vs.

ZEALANDIA HOLDING COMPANY, INC., f/k/a
FESTIVA HOSPITALITY GROUP, INC.;
CELEBRATION WORLD RESORT MARKETING, LTD.;
B.L. VACATION OWNERSHIP, INC.; PATTON HOSPITALITY
MANAGEMENT, LLC; FESTIVA ORLANDO RESORT
HOMEOWNERS ASSOCIATION, INC., f/k/a CELEBRATION WORLD
RESORT OWNERS ASSOCIATION, INC.; and RCI, LLC,

                 Defendants.

_____/

## <u>AMENDED COMPLAINT</u>

       COME NOW, the Plaintiffs, DAVID REEVES, BILLIE REEVES, ANASTASIOS PLEVRAKIS, ALLISON PLEVRAKIS, AMPHON JOHNSON, and ALFREINO JOHNSON (hereinafter referred to as "Plaintiffs"), by and through their undersigned attorney, pursuant to Fed. R. Civ. P. 15(a)(1)(B), and bring this action individually and on behalf of all others similarly situated, seeking relief and damages from the Defendants, (1) ZEALANDIA HOLDING COMPANY, INC., f/k/a FESTIVA HOSPITALITY GROUP, INC.; (2) PATTON HOSPITALITY, LLC.; (3) B.L. VACATION OWNERSHIP, INC.; (4) CELEBRATION WORLD RESORT MARKETING, LTD.; (5) FESTIVA ORLANDO RESORT HOMEOWNERS ASSOCIATION, INC. f/k/a CELEBRATION WORLD RESORT OWNERS ASSOCIATION, INC.; and (6) RCI, LLC, and allege and as follows:

1.   Pursuant to Fed. R. Civ. P. 23(b)(3), Plaintiffs bring these claims on behalf of themselves and on behalf of those similarly situated seeking damages resulting from Defendants' acts, practices, and omissions.

2.   This action is brought on behalf of all timeshare owners at Festiva's Orlando Resort, f/k/a Celebration World Resort (hereinafter referred to as the "Resort"), who paid valuable

consideration to purchase RCI Points which were subsequently taken away with no refund issued.

3. The REEVES are residents of Iowa.

4. The PLEVRAKISES are residents of Pennsylvania.

5. The JOHNSONS are residents of Georgia.

## JURISDICTION AND VENUE

6. This is an action for damages in excess of $75,000.00.

7. This Court has Subject Matter Jurisdiction of this action pursuant to 28 U.S.C. §§ 1332(d)(2) 1441, 1446, and 1453.

8. Plaintiffs, at all material times hereto, owned at least one Timeshare Interest at the Resort located in Osceola County, Florida.

9. Defendants, ZEALANDIA HOLDING COMPANY, INC., f/k/a FESTIVA HOSPITALITY GROUP, INC. (hereinafter referred to individually as "ZEALANDIA"), its subsidiaries and affiliated entities, including but not limited to PATTON HOSPITALITY, LLC. (hereinafter referred to individually as "PATTON HOSPITALITY"), Festiva Development Group, LLC (hereinafter referred to individually as "Festiva Development"), and CS CWR Holdings, LLC (hereinafter referred to individually as "CS CWR Holdings") together operate, manage, and otherwise control the Resort since approximately September 30, 2011. ZEALANDIA, PATTON HOSPITALITY, Festiva Development, and CS CWR Holdings are hereinafter referred to collectively as "Festiva" where appropriate.

10. Defendant CELEBRATION WORLD RESORT MARKETING, LTD. (hereinafter referred to as "CWRM, LTD.") operated, managed, and otherwise controlled the Resort from approximately 1999 through approximately September 30, 2011.

11. Defendant FESTIVA ORLANDO RESORT OWNERS ASSOCIATION, INC., f/k/a CELEBRATION WORLD RESORT HOMEOWNERS ASSOCIATION, INC. (hereinafter referred to as the "ASSOCIATION") is the mandatory owners Association designated as the "managing entity" of the Resort.

12. Defendant B.L. VACATION OWNERSHIP, INC. (hereinafter referred to as B.L.) at all material times to this action was a Florida Corporation doing business in the State of Florida and the "Creating Developer" of the Resort.

2

13. Defendant, RCI, LLC (hereinafter referred to as "RCI") at all times material to this action was a for profit foreign Limited Liability Company, doing business in the State of Florida and in a contractual relationship requiring them to provide a Timeshare "Exchange Program" with the entities managing and in control of the Resort.

14. Venue is appropriate pursuant to 28 U.S.C. § 1391(b)(1)-(2) because CWRM, LTD. and the ASSOCIATION have their principal places of business within this District where a substantial part of the events giving rise to all claims arose.

<b><u>FACTUAL BACKGROUND</u></b>

**<u>Harm Inflicted on the Class.</u>**

15. Beginning as far back as October 2005 through approximately August of 2011, Plaintiffs and the proposed class members were fraudulently induced to purchase a Timeshare Interest at the Resort and buy membership into RCI's Exchange Program in connection with their purchases (hereinafter referred to as the "Transaction(s)" or "Fraudulent Transactions(s)").

16. The Transactions were fraudulent because the primary consideration for the purchase was the promise of an exorbitant number of RCI Points which CWRM, LTD. had no right to sell.  In most cases, the class members exchanged their deeded Timeshare Interest for a <u>lesser</u> deeded interest, and paid to do so solely because of the additional RCI Points.

17. The Transactions were fraudulent because the contracts offered to and accepted by Plaintiffs and the proposed class members intentionally contained an incorrect and non-existent "Resort I.D. Number," which is a unique number RCI assigns each and every Resort under its "Exchange Program."

18. The Transactions were fraudulent because the Point totals sold and ratified grossly exceeded the established "values" RCI had previously assigned the units. At the time of each and every Fraudulent Transaction, the Point "values" were set by RCI, and no entity has the contractual or legal authority to sell Points in connection with a Timeshare purchase that exceed the established value.

19. The Plaintiffs and the proposed class members jumped at the opportunity to purchase because this large number of RCI points would allow them to take as many as 5 additional vacations every year.

20. RCI ratified the Fraudulent Transactions by accepting proceeds in connection with the transactions, and in many cases, "depositing" the inflated number of Points into the Owners' RCI Accounts. RCI received a financial benefit from the Fraudulent Transactions by receiving an up-front fee and continual dues, assessments, charges, and fees.

21. The ASSOCIATION has acknowledged the Fraudulent Transactions were fraudulent, stating in a letter, cited and discussed *infra*, labeling them "apparently fraudulent…"

22. Despite the ASSOCIATION'S new-found revelation that the Fraudulent Transactions were "apparently fraudulent," the ASSOCIATION consented to, was aware of, and through members of its Board of Directors participated in the Fraudulent Transactions.

23. B.L. is responsible for the harm to Plaintiffs and the proposed class members because as the "Developer" of the Resort as defined by the Declaration and Timeshare Act, it owed Plaintiffs and the proposed class members a duty to supervise all sales and marketing of Timeshare Interests at the Resort, including the Fraudulent Transactions.

24. In the fall of 2011, ZEALANDIA acquired the Resort and, together with RCI, removed the Points that the Plaintiffs and the proposed class members purchased in connection with the Fraudulent Transactions.

25. Although ZEALANDIA and RCI removed the Points, they failed and refused to offer any refund or other compensation to the Plaintiffs, who paid for these Points. RCI points were to be deposited annually or bi-annually for a <u>lifetime</u>, instead the Points were revoked within months or years of the purchase.

26. ZEALANDIA stated in a letter, cited and discussed *infra*, the Point totals sold to Plaintiffs and the proposed class members in the Fraudulent Transactions were "distorted" and "too good to be true."

27. Despite ZEALANDIA'S acknowledgement, it has continued to collect amounts Plaintiffs and the proposed class members paid in connection with and arising out of the Fraudulent Transactions by virtue of it acquiring the right to receive amounts due under financing agreements obtained as part of the Fraudulent Transactions.

28. As a result of ZEALANDIA and RCI refusing to honor the Point totals purchased or provide any compensation, Plaintiffs and the proposed class members were deprived of

the principal consideration of their purchases and are left with drastically reduced Point values than what they paid for.

29. Plaintiffs and the proposed class members have not been given any refunds or other compensation despite being victims of the fraudulent scheme nor have they been given a full, adequate, or truthful explanation of their "unfortunate situation" as described by the ASSOCIATION in a letter discussed *infra*.

30. Importantly, instead of offering a refund, ZEALANDIA, and its affiliated entities, are using the fact that Plaintiffs and the proposed class members have been defrauded as a marketing opportunity to convince the Plaintiffs and proposed class members to purchase additional vacation related services, this time at a cost of approximately $8,000.

31. RCI, the entity responsible for administering Points and managing Plaintiffs and the proposed class members' RCI Accounts, also benefited financially from the Fraudulent Transactions and has refused to offer a refund or other compensation to the Plaintiffs and the proposed class members, despite acknowledging the Fraudulent Transactions were improper by refusing to honor the Point totals they initially approved and ratified when the Fraudulent Transactions were entered into.

32. The Plaintiffs have been harmed as they spent, on average, $5,000 for a lifetime of annually accruing RCI Points, only to have the Points taken away with no refund offered.

33. To add insult to injury, ZEALANDIA is using the fact Plaintiffs and the proposed class members have been defrauded as a marketing opportunity by pushing them spend an additional $8,000 to "upgrade" again, instead of compensating the Plaintiffs for their loss. Meanwhile, ZEALANDIA continues to profit off of the Fraudulent Transactions by accepting payments for the Fraudulent Transactions through the established payment plans.

**The Celebration World Resort Entities.**

34. The Resort is a Timeshare development located in Osceola County, Florida and subject to Florida Statutes, Chapter 721 (hereinafter referred to as the "Timeshare Act") and the "Declaration of Covenants, Conditions and Restrictions for Celebration World Resort, A Vacation Ownership Resort" (hereinafter referred to as the "Declaration") recorded in the Official Public Records of Osceola County, FL, Book 1687, at Pages 832, et. al.  A true and correct copy of the Declaration is attached hereto as Exhibit "1."

35. B.L. was the original or "Creating Developer" of the Resort, as evidenced by the Declaration and defined in Fla. Stat. § 721.05(10)(a).  See Exhibit "1," Page 1.

36. At the inception of the Resort through approximately August 4, 2011, CWRM, LTD. was a "Concurrent Developer," as evidenced by the Resorts' Public Offering Statement and defined in Fla. Stat. § 721.05(10)(c).  A true and correct copy of the "Public Offering Statement Text" is attached hereto as Exhibit "2."

37. By virtue of being a "Concurrent Developer," CWRM, LTD. had all duties, rights, and obligations as a "Developer" of a "Timeshare Plan" (as defined by Fla. Stat. § 721.05(21)) in accordance with the Declaration and Fla. Stat. §721.05(10)(b).

38. At all material times hereto, CELEBRATION WORLD RESORT, INC. (hereinafter referred to as "CWRM, Inc.") was the sole general partner of CWRM, LTD.  A true and correct copy of CWRM, LTD.'S Certificate of Partnership is attached hereto as Exhibit "3."

39. At the inception of the Resort through approximately September of 2011, Celebration World Resort Management, Ltd. (hereinafter referred to as "CWR Management, Ltd.") was the "management company" in charge of the day-to-day operations of the Resort.  A true and correct copy of the Initial Management Agreement found in the Resort's Public Offering Statement is attached hereto as Exhibit "4."

40. Throughout the course of CWR Management, Ltd.'s existence, Celebration World Resort Management Inc. (hereinafter referred to as "CWR Management, Inc.") was its sole general partner.  A true and correct copy of CWR Management Ltd.'s Certificate of Partnership is attached hereto as Exhibit "5."

41. While CWRM, LTD. was the "Concurrent" Developer, it had the authority and discretion to appoint and control the members of the ASSOCIATION'S Board of Directors pursuant to Article XVI of the Declaration, because "transfer" of control had not occurred.

42. From approximately 2001-2011, all CWR entities and the ASSOCIATION'S Board of Directors were under the complete dominion and control of Joseph Dahruj who controlled every facet of the Resort, including but not limited to appointing and controlling the Board of Directors, managing the Resort, marketing, selling, and advertising Timeshare Interests and RCI Points in connection with the RCI Exchange Program.

**B.L. Is Statutorily Liable for CWRM. LTD. Offering the Fraudulent Transactions as the "Developer."**

43.   B.L. is the "Creating Developer" of the Timeshare Plan and Resort, making it a "Developer" under the Definitions provided in Article I, paragraph O of the Declaration and Fla. Stat. § 721.05(10) .  See Exhibits "1" and "2."

44.   As the Resort's "Developer" during the timeframe CWRM, LTD. was offering, promoting, advertising, contracting for, and closing the Fraudulent Transactions, B.L. is liable for all tortious and illegal conduct with respect to these activities pursuant to Fla. Stat. § 721.056.

45.   To cease being a "Developer" of the Timeshare Plan, B.L. must convey its "Developer's rights" in a written instrument to a successor or assign pursuant to Article I, paragraph O of the Declaration.

46.   From November 2007 through April 2010, B.L. conveyed CWRM, LTD. Timeshare Interests by at least five (5) Warranty Deeds (hereinafter referred to as the "B.L. Deeds"). True and correct copies of the B.L. Deeds are attached hereto as Exhibit "6."

47.   The B.L. Deeds do not assign or convey B.L.'S "Developer's rights" because they specifically state, "Grantee (CWRM, LTD.) shall not be deemed a successor or assign of Grantor's (B.L.) rights or obligations under the aforedescribed Declaration or any instrument referred to therein" (emphasis added).

48.   Absent a specific Assignment of "Developer's rights," B.L. retains its duties, rights, and obligations as a "Developer" under the Declaration and the Timeshare Act.

49.   Upon information and belief, B.L. has not assigned or conveyed its "Developer's rights" and is still a "Developer" of the Resort as defined in the Declaration and Timeshare Act.

50.   Pursuant to Fla. Stat. § 721.056:

> *Notwithstanding obligations placed upon any other persons* by this chapter, it is the *duty of the developer* to supervise, manage, and control *all aspects of the offering of a timeshare plan*, including, but not limited to, promotion, advertising, contracting, and closing. Any violation of this section which occurs during such offering activities shall be deemed to be a violation by the developer as well as by the person actually committing such violation. (emphasis added).

51. As the Developer, B.L. is liable for all violations or illegal conduct pertaining to the offering of a timeshare plan, regardless of the individual or entity actually committing the violation.

52. "Offer" is defined as "the solicitation, advertisement, or inducement, or any other method or attempt, to encourage any person to acquire the opportunity to participate in a timeshare plan." Fla. Stat. § 721.05(24).

53. While B.L. was still the "Developer," CWRM, LTD. advertised, solicited, and induced Plaintiffs and the proposed class members to acquire an Interest in the Timeshare Plan, the principal consideration of which was in increased amount of RCI Points.

54. Had B.L. adequately supervised, managed, and controlled the offering of the Timeshare Plan, the Fraudulent Transactions would not have been promoted, contracted for, or closed and Plaintiffs and the proposed class members would not have suffered financial harm.

**The Nature and Benefits of RCI Points and the RCI "Exchange Program."**

55. Since the Resort's inception, B.L. and CWRM, LTD. planned and subsequently made contractual arrangements with RCI to operate an "Exchange Program" as defined by Fla. Stat. § 721.05(16) for Owners and Purchasers at the Resort.  See Exhibit "2," Paragraph 8.

56. RCI Points enable Owners greater flexibility in visiting Resorts affiliated with RCI throughout the world.  Exchange Programs are common throughout the timeshare and resort vacation industry and a vital part of Timeshare Owners' vacation experiences. A summary of the nature and benefits of RCI Points advertised to the public is attached here to as Exhibit "7."

57. Under the RCI Exchange Program, Timeshare Owners "deposit" their vacation interests into RCI'S "Spacebank," and in exchange receive Points that correspond with the "value" RCI assigns to the "deposited" Timeshare Interest.  A diagram of the basic principle, purpose, and nature of the RCI Exchange Program available to the public on RCI's website is attached hereto as Exhibit "8."

58. When an Owner "deposits" their Timeshare Interest into the RCI Exchange Program, they give up their right to reserve vacation time at the Resort or otherwise "use" the

Timeshare Interest they own title to.  Once an Owner enrolls into the RCI Exchange Program, reservations at the Resort are made through the RCI Exchange Program.

59.  For Resort Owners, the more Shares (Vacation Ownership Shares which represent an ownership interest in the Resort) contained in an Owners' Deed, the higher the RCI "value" for a Timeshare Interest will be.

60.  Periodically, RCI issues a Directory of Affiliated Resorts (where RCI Points can be exchanged for vacation time) containing the corresponding Point "value" it sets for the unit type and time period.  A true and correct copy of certain pages from the 2013/2014 Directory of Affiliated Resorts available to the public on RCI's website showing the current "value" assigned to all Resort units are attached hereto as Exhibit "9."

61.  Upon information and belief, the "value" RCI has assigned to the Resort units in the 2013/2014 Directory has not changed during all material times to this action.

62.  When an Owner "deposits" their Timeshare Interest into the "Spacebank," they are supposed to receive the amount of Points *equaling* the established "value" of the "deposited" Timeshare Interest.

63.  Depending on the nature of their Timeshare Interest, membership in the RCI Program guarantees Owners will *continually* receive either annually or biannually the amount of Points reflecting the "value" of their Timeshare Interest.

64.  On or about January 15, 2004, RCI, the ASSOCIATION, and CWRM, LTD. signed a "Resort Affiliation and Owners Association Agreement" (hereinafter referred to as the "Resort Affiliation Agreement").  A true and correct copy of the Resort Affiliation Agreement is attached hereto as Exhibit "10."

65.  Under the Resort Affiliation Agreement, CWRM, LTD. and the ASSOCIATION received authority to sell and/ or promote membership into the RCI Exchange Program.

66.  Under the Resort Affiliation Agreement, when CWRM, LTD. sells a membership into the RCI Exchange Program, the Purchaser fills out an application supplied by RCI.  A true and correct copy of an Enrollment Application (hereinafter referred to as a "Participation Agreement") as defined in Paragraph 1.3 of the Resort Affiliation Agreement is attached hereto as Exhibit "11."

67. Each Participation Agreement contains a space for the "Resort I.D." RCI has assigned to a particular Resort, the unit type, week, and Point amount that should be "deposited" in the Purchaser's "RCI Account" (hereinafter referred to as an "Account").

68. At all material times to this action, the Resort's "Resort I.D." has been "5389."

69. Upon receipt of a Purchaser's Participation Agreement, RCI has the right to accept or reject the purchaser's enrollment into the RCI Exchange Program, and retains a fee paid by the Purchaser if the Application is accepted.  See Exhibit "10," Paragraphs 2.3 and 5.1.1.

70. Once RCI accepts enrollment into its Exchange Program, RCI Points are assigned and distributed into each Owners' individual Account until they are used in accordance with their terms and conditions.  It is RCI's responsibility to "deposit" Points into and manage the Accounts.

71. Depending on the "value" RCI assigns to the Timeshare Interest "deposited" into the "Spacebank," which is a fixed amount depending on the resort, Owners *continually* receive Points on an annual, or biannual basis.

**The Fraudulent Transactions.**

72. Upon information and belief, dating back to at least October of 2005, CWRM, LTD., the ASSOCIATION, RCI, Joseph Dahruj, and his attorney, devised a scheme to sell existing Owners and prospective Purchasers Timeshare Interests by selling RCI Points that greatly exceeded the established "value" RCI had assigned to the Timeshare Interest or "inventory" sold to the purchaser.

73. Under the RCI Exchange Program, the "value" of the Timeshare Interest and corresponding Point allocation are s*et at the time the Timeshare Interest is "deposited" into the "Spacebank,"* and cannot vary or be altered under the terms and conditions of the Program. However, RCI broke its own rules in allowing the Fraudulent Transactions by allowing extremely inflated amounts of RCI points to be offered, promised, sold, and ultimately taken away from unsuspecting purchasers.

74. These Fraudulent Transactions were fraudulent because the Points sold by CWRM, LTD. and assigned by RCI greatly exceeded the "value" RCI assigned to the Timeshare Interests CWRM, LTD. sold the Purchasers and induced them to "deposit" into the "Spacebank."

75. Upon information and belief, all or most of the RCI Participation Agreements executed in conjunction with the Fraudulent Transactions have the Resort I.D. intentionally and falsely identified as "6731," which does not exist according to materials produced and disseminated by RCI.

76. The Resort has never been assigned a Resort I.D. numbered "6731."

77. The Fraudulent Transactions were fraudulent and the RCI Participation agreements are invalid on their face because (1) the Resort I.D. numbers are non-existent and (2) the amount of Points listed on the agreements are grossly inflated compared to the Point "value" established by RCI at the time of each and every Fraudulent Transaction; each of which are material facts to the Fraudulent Transactions, indisputably false and inaccurate at the time the statements were written, known to be inaccurate by CWRM, LTD. and RCI, and *written* on the face of each and every Participation Agreement.

78. The Fraudulent Transactions induced Plaintiffs and the proposed class members to enter into a Purchase Contract to buy a Deeded Timeshare Interest from CWRM, LTD. and enroll into the RCI Exchange Program.

79. As part of its efforts to sell these Fraudulent Transactions, CWRM, LTD. hired Larry Volte to oversee a sales "telemarketing department."

80. Sales representatives working in the telemarking department contacted existing Owners at the Resort and prospective Purchases, located throughout the United States and in foreign countries, via telephone, electronic mail, the United States Postal Service, or other private interstate carriers, in furtherance of and an essential component to fraudulently induce them into the Fraudulent Transactions.

**The Reeves are Induced into a Fraudulent Transaction.**

81. On or about June 29, 2004 the REEVES purchased a Timeshare Interest at the Resort. A true and correct copy of the Deed evidencing their purchase is attached hereto as Exhibit "12."

82. The REEVES paid $10,810.00 for their Initial Purchase.

83. In conjunction with their Initial Purchase, the REEVES "deposited" their Timeshare Interest into RCI's "Spacebank," and received approximately 54,600 Points annually.

84. In May of 2011, Mike Sills, an agent or employee of CWRM, LTD. contacted the REEVES via telephone, at their home in Iowa, offering them Fraudulent Transaction.

85. Mike Sills sent the REEVES an e-mail detailing the offer to enter into the Fraudulent Transaction to purchase an interest in the Timeshare Plan by selling them a "VERY LIMITED amount of inventory" (emphasis original). A true and correct copy of the offer is attached hereto as Exhibit "13."

86. The Fraudulent Transaction comprised of having the REEVES deed back the property they Initially Purchased and receiving a new Deed representing a new Timeshare Interest in the Timeshare Plan.

87. However, despite offering the REEVES a Timeshare Interest with a *lower* assigned RCI "value" than their Initial Purchase, CWRM, LTD. offered the REEVES significantly more RCI Points than they were annually receiving from their Initial Purchase; either 110,000 or 125,000 Points annually. See Exhibit "13."

88. Shortly thereafter, the REEVES called the Resort and spoke with several individuals, including Helen Morello, who confirmed Mike Sills worked for CWRM, LTD. and confirmed the offer was valid.

89. Several days after Mike Sills first offered the REEVES the Fraudulent Transaction, Helen Morello sent the REEVES a confirmation e-mail memorializing the material terms of the Fraudulent Transaction. A true and correct copy of Helen Morello's conformation is attached hereto as Exhibit "14."

90. In reliance on the representations made as embodied in the e-mails memorializing the offers, the REEVES accepted the offer (purchasing 220,000 Bi-annual or 110,000 Annual Points) and paid a total of $5,127.55 to RCI and CWRM, LTD. True and correct copies of the Receipts evidencing payment to RCI and CWRM, LTD. are attached hereto as Exhibit "15."

91. As part of the Fraudulent Transaction, the REEVES deeded their Initial Purchase, which was paid in full, to CWRM, LTD., it and its successors or assigns to once again resell it to another Purchaser. A true and correct copy of the REEVES Deed conveying their Initial Purchase to CWRM, LTD. is attached hereto as Exhibit "16."

92. After the REEVES deeded their Initial Purchase to CWRM, LTD., they received a Deed for their new purchase necessary to complete the Fraudulent Transaction. A true and correct copy of the Deed necessary to complete the Fraudulent Transaction is attached hereto as Exhibit "17."

12

93. The Points promised and paid for in connection with the Fraudulent Transaction were significantly in excess of the "value" RCI assigned to the Timeshare Interest the REEVES purchased and "deposited" into the "Spacebank" for their purchase.

94. CWRM, LTD. knew it was selling RCI Points that do not match the "value" assigned to the Timeshare Interest the REEVES purchased and "deposited" into the "Spacebank."

95. CWRM, LTD. knew it was required under the Resort Affiliation Agreement and numerous documents generated, provided, and advertised by RCI (including but not limited to those attached hereto) to only sell Points assigned to a Purchaser's Timeshare Interests matching the "value" assigned by RCI.

96. CWRM, LTD. is vicariously liable for the acts of its sales representatives for the acts of its employees in connection with selling the Fraudulent Transactions.

97. CWRM, LTD. is vicariously liable for the acts of its sales representatives in the promoting, advertising, contracting, and closing of Timeshare Interests pursuant to Fla. Stat. § 721.056.

98. RCI knew that the REEVES Point total assigned to their Timeshare Interest was in excess of the "value" it had assigned to the week and unit type the REEVES "deposited" into the "Spacebank." However, it still approved the REEVES' "deposit" and RCI Membership by ratifying and accepting the Participation Agreement and accepting and retaining $244.00 transaction fee.

99. Pursuant to the terms and nature of the Fraudulent Transaction, the REEVES were supposed to receive their RCI Points in May of 2012.

100. The REEVES never received the additional Points they purchased in connection with the Fraudulent Transaction.

101. The REEVES never received a refund of any amounts paid in connection with the Fraudulent Transaction.

102. The REEVES, as a result of the Fraudulent Transaction, paid $5,127.55 for the Points they purchased but did not receive and are left with a Timeshare Interest containing a lower Point "value" than they Initially Purchased.

**The Plevrakises are Induced into a Fraudulent Transaction.**

103. On or about June 29, 2004 the PLEVRAKISES purchased a Timeshare Interest at the Resort (hereinafter referred to as their "Initial Purchase").  A true and correct copy of the Deed evidencing their Initial Purchase is attached hereto as Exhibit "18."

104. In conjunction with their Initial Purchase, the PLEVRAKISES "deposited" their Timeshare Interest into RCI's "Spacebank," and received 85,800 Points annually.

105. On or about May 16, 2010, while visiting the Resort, the PLEVRAKISES were induced by John Pietz, Elizabeth Diaz, and Helen Morello, all agents or employees of CWRM, LTD. into entering into a Fraudulent Transaction.

106. The PLEVRAKISES deeded their Initial Purchase, which was paid in full, to CWRM, LTD.   A true and correct copy of the Deed is attached hereto as Exhibit "19."

107. The PLEVRAKISES paid $3,545.00 for their Fraudulent Transaction, and received a new Deed from CWRM, LTD. with 252,000 Bi-annual (126,000 Annual) RCI Points.  A true and correct copy of the Deed evidencing the Timeshare Interest the PLEVRAKISES acquired and "deposited" into the "Spacebank" in their Fraudulent Transaction is attached hereto as Exhibit "20."

108. The PLEVRAKISES' RCI Participation Agreement executed in the Fraudulent Transaction, containing the non-existent Resort I.D. "6731," is attached hereto as Exhibit "21."

109. RCI accepted the Participation Agreement and retained the fee the PLEVRAKISES paid in connection with their Fraudulent Transaction.

110. On April 4, 2011 RCI "deposited" 252,000 Points into the PLEVRAKISES' Account in accordance with its ratification and acceptance of the PLEVRAKISES' enrollment into the RCI Exchange Program and "deposit" of their Timeshare Interest into the "Spacebank."

111. In January of 2013, the PLEVRAKISES received notification from "Festiva Member Services" that some Owners' Accounts were being re-adjusted and their Points would be decreasing.

112. The PLEVRAKISES subsequently contacted RCI, and were notified that their Points were "adjusted," replacing the 252,000 Bi-annual Points they paid for in connection with

Fraudulent Transaction with 31,000 Bi-annual Points.  A true and correct copy of the PLEVRAKISES' RCI Points Activity Statement is attached hereto as Exhibit "22."

113. The PLEVRAKISES never received a refund of any amounts paid in connection with their Fraudulent Transaction.

114. The PLEVRAKISES, as a result of the being induced into the Fraudulent Transaction, paid $3,545.00 for more RCI Points but are left with a lower Bi-annual Point "value" than when they Initially Purchased.

**The Johnsons are Induced into a Fraudulent Transaction.**

115. On or about November 6, 2001 the AMPHON JOHNSON (known at the time as Amphon Her) purchased a Timeshare Interest at the Resort (hereinafter referred to as her "Initial Purchase").  A true and correct copy of the Deed evidencing her Initial Purchase is attached hereto as Exhibit "23."

116. In conjunction with her Initial Purchase, AMPHON JOHNSON "deposited" her Timeshare Interest in to RCI's "Spacebank," and received 62,300 Points annually.

117. On or about December 11, 2007, while visiting the Resort, AMPHON JOHNSON, and her husband ALFREINO JOHNSON were induced by Al Roman, Joseph Dahruj Jr. and Shay Funderburk, all agents or employees of CWRM, LTD., into entering into a Fraudulent Transaction.

118. AMPHON JOHNSON deeded her Initial Purchase, which was already paid in full, to CWRM, LTD.  A true and correct copy of the Deed is attached hereto as Exhibit "24."

119. The JOHNSONS paid approximately $5,000.00 for their Fraudulent Transaction, and received a new Deed from CWRM, LTD. with 133,500 Annual RCI Points.  A true and correct copy of the Deed evidencing the Timeshare Interest the JOHNSONS acquired and "deposited" into the "Spacebank" in their Fraudulent Transaction is attached hereto as Exhibit "25."

120. The JOHNSONS' RCI Participation Agreement executed in the Fraudulent Transaction, containing the non-existent Resort I.D. "6731," is attached hereto as Exhibit "26."

121. Despite purchasing a Timeshare Interest in the *same Resort* as the Initial Purchase, the JOHNSONS' RCI Participation Agreement has two different Resort I.D. numbers.

122. RCI accepted the Participation Agreement and retained the fee the JOHNSONS paid in connection with their Fraudulent Transaction.

123. RCI honored the JOHNSONS' Points and "deposited" the 133,500 Points into their Accounts annually until December of 2012.

124. In January of 2013, the JOHNSONS received notification from "Festiva Member Services" that some Owners' Accounts were being re-adjusted and their Points would be decreasing.

125. The JOHNSONS' Points were reduced to from 133,500 Points to 31,000 Points annually.

126. The JOHNSONS obtained financing for their Fraudulent Transaction from CWRM, LTD. True and correct copies of their Note and Mortgage are attached hereto as Exhibit "27."

127. The JOHNSONS have made each and every payment under the terms of their Note and Mortgage, and have complied with each and every term and condition under all documents executed in the Fraudulent Transaction.

128. After Festiva acquired the Resort, the JOHNSONS have been making their monthly payments under the Notes and Mortgage to Festiva Development, who has been collection payments and/or servicing the Note and Mortgage for ZEALANDIA.

129. ZEALANDIA, and its affiliated entities, have retained all amounts paid by the JOHNSON under the terms of their Note and Mortgage securing the Timeshare Interest purchased in the Fraudulent Transaction, despite refusing to honor the Points, which were the sole benefit of the purchase from the JOHNSONS.

130. The JOHNSONS, as a result of being induced into the Fraudulent Transaction, paid CWRM, LTD., RCI, and ZEALANDIA for more RCI Points but are left with a lower Annual  Point "value" than when they Initially Purchased.

**Festiva Acquires the Resort and, along with RCI and the ASSOCIATION, Reduces Plaintiffs' and the Proposed Class Members' Points.**

131. Capital Source Finance, LLC (hereinafter referred to as "Capital Source") loaned CWRM, LTD. and Celebration World Resort, Ltd. (an affiliated entity also controlled by Joseph Dahruj) money pursuant to several lines of credit (hereinafter referred to as the "Loans").

132. As collateral for the Loans, CWRM, LTD. and Celebration World Resort, Ltd. pledged their "Developer Rights" in the Resort.

133. Subsequent to the Loans being granted, CWRM, LTD., Celebration World Resort, Ltd., and CWR Borrower, LLC (another affiliated entity of CWRM, LTD. and also controlled

by Joseph Dahruj) defaulted on their obligations and Capital Source, by and through its subsidiary CS CWR Holdings foreclosed on the Loans.

134. At the conclusion of the foreclosures, CWRM, LTD. and Celebration World Resort, Ltd. "Assigned" their Developer's Rights to CS CWR Holdings, which became the "Developer" by virtue of it becoming the "Successive Developer" pursuant to the Declaration as defined by Fla. Stat. § 721.05(10)(b). A true and correct copy of the assignment of Developer's Rights is attached hereto as Exhibit "28."

135. At the time CS CWR Holdings received the Assignment of Developer's Rights, it was an affiliated entity of Capital Source, because it was a wholly owned subsidiary of Capital Source Bank, also an affiliated entity or parent corporation of Capital Source.

136. On or about September 30, 2011, Festiva Development Group acquired CS CWR Holdings from Capital Source Bank, making it the sole managing member. A true and correct copy of the "Assignment of Membership Interests" is attached hereto as Exhibit "29."

137. After Festiva acquired the Resort, it changed the Resort's name to "Festiva Orlando Resort."

138. Since acquiring the Resort, several different entities all related by common ownership and control to ZEALANDIA have served the role of both "Developer" and "Managing Entity" as defined in the Declaration and Timeshare Act.

139. At all material times hereto, Festiva Development was a wholly owned subsidiary of ZEALANDIA, which is its sole General and Managing Partner. A true and correct copy of Festiva Development's 2013 Annual Report filed with Florida's Secretary of State is attached hereto as Exhibit "30."

140. As Festiva Development's parent company and being at the top of the corporate structure, ZEALANDIA has been in operational control of the Resort since Festiva Development acquired CS CWR Holdings. Copies of documents evidencing ZEALANDIA'S claims it "purchased" the Resort and is in charge of its operation are attached hereto as Exhibit "31."

141. ZEALANDIA, despite not itself being a "Successive Developer" of the Resort, has acted as the Developer of the Resort through its complete corporate control and dominion over

Festiva Development, which has a 100% managerial capacity over the "Successive Developer," CS CWR Holdings.

142. Since acquiring the Resort, ZEALANDIA has been financially benefitting from the Fraudulent Transactions by accepting and retaining "loan receivables" from Purchasers in connection with loans CWRM, LTD. granted some purchasers, including but not limited to the JOHNSONS, in connection with the Fraudulent Transactions.  See Exhibit "31."

143. Additionally, since acquiring the Resort, "Festiva Member Services," a division of ZEALANDIA, has sent Owners numerous correspondence regarding the operation and management of the Resort.  True and correct copies of correspondence sent from "Festiva Member Services" (hereinafter referred to as the "Festiva Letters") are attached hereto as Exhibit "32."

144. Upon Festiva's acquisition of the Resort, PATTON HOSPITALITY has been the "managing entity" of the Resort, fulfilling the same role CWR Management, Ltd. had previously performed by entering into a management agreement with the Resort.

145. At all material times hereto, PATTON HOSPITALITY was a wholly owned subsidiary of ZEALANDIA.  A true and correct copy of PATTON HOSPITALITY'S 2013 Annual Report filed with the Florida Secretary of State is attached hereto as Exhibit "33."

146. ZEALANDIA, despite not itself being a "manager" of the Resort, has acted as the Manager through its complete corporate control and dominion over PATTON HOSPITALITY.

147. Upon acquisition of the Resort, ZEALANDIA, and its subsidiaries and affiliates, have appointed and controlled the ASSOCIATION'S Board of Directors under their rights as the "Successive Developer."

148. Upon information and belief, ZEALANDIA, through its employees, directors, subsidiaries, and affiliated entities, was aware of the Fraudulent Transactions prior to purchasing and acquiring the Resort.

149. Since acquiring the Resort, Festiva has refused to honor the RCI Points sold to Owners in the Fraudulent Transactions. See Exhibit "32."

150. Since acquiring the Resort, Festiva claimed it was unaware of the Fraudulent Transactions when it acquired the Resort.  See Exhibit "32."

18

151. Since acquiring the Resort, ZEALANDIA "requested" RCI "adjust" Owners' RCI Accounts, reducing their amount of RCI Points in their Accounts and to be allocated in the future.  See Exhibit "32."

152. RCI was aware of the amount of Points sold to Plaintiffs and the proposed class members purchased as part of their Fraudulent Transactions, and ratified them by accepting fees and "depositing" Points into their Accounts.

153. The ASSOCIATION knew all material elements of the Fraudulent Transactions by virtue of its Board of Directors, all being employees of CWRM, LTD. prior to Festiva acquiring the Resort, actively participating in or having knowledge of the scheme to induce Owners and Purchasers into the Fraudulent Transactions.

154. The ASSOCIATION has continually benefited from the Fraudulent Transactions as a result of collecting annual maintenance fees Owners are required to pay under the Declaration and Timeshare Act as a condition to owning the Timeshare Interests purchased in the Fraudulent Transactions.

155. ZEALANDIA has benefited from the Fraudulent Transactions by collecting, either directly or through its subsidiaries or affiliated entities, amounts due under financing agreements Purchasers executed in connection with their Fraudulent Transactions.

156. ZEALANDIA has failed to offer an adequate remedy to victims of the Fraudulent Transactions, and instead has attempted to obtain additional financial gain by pushing membership into the Festiva Adventure Club (a "Vacation Club" as defined by the Timeshare Act), RTX (an "Exchange Program"), and "Vacation Condos;" all of which ZEALANDIA and its affiliated entities have an ownership and/or controlling interest.

157. Despite the ASSOCIATION owing Plaintiffs and the proposed class a fiduciary duty, it has placed the Resort's financial interests before the Owners it acknowledges were victims of "seemingly fraudulent and otherwise wrongful actions."  A true and correct copy of a letter sent by the ASSOCIATION'S Board of Directors to Resort Owners explaining it and Festiva's position regarding the subject matter of this litigation, (hereinafter referred to as "The Board of Director's Letter") is attached hereto as Exhibit "34."

## CLASS REPRESENTATION ALLEGATIONS

### Class Definitions

158. This action is brought by Plaintiffs as a class action, on their own and on behalf of all others similarly situated pursuant to Fed. R. Civ. P. 23(b)(3).

159. The PLEVRAKISES are the Class Representatives as to Counts I, II, III, IV, VII, and VIII, (hereinafter referred to as the "Class") which is defined as: All individuals who (1) purchased a Timeshare Interest at the Resort from CWRM, LTD., (2) enrolled in the RCI Exchange Program by executing a Participation Agreement containing a Point amount exceeding the established value (as identified in RCI'S Directory of Affiliated Resorts in effect at the time of the transaction) and (3)  had the Point amounts identified on their Participation Agreements subsequently reduced, adjusted, deleted, or not otherwise honored by Defendants. Excluded from the Class are any employee of the Court; Defendants and any of their respective subsidiaries, affiliates, officers and directors; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, family members, and assigns of any such excluded party.

160. The REEVES are the Subclass Representatives as to Counts V and VI (hereinafter referred to as the "RICO Subclass") which is defined as: All individuals who otherwise meet the definition of the Class set forth in Paragraph 159 AND were contacted by CWRM, LTD., its agents, employees, or affiliated entities through telephone calls, electronic mail, the United States Postal service, or other interstate carriers in interstate or foreign commerce for the purpose of offering, selling, describing, advertising, soliciting, inducing, or closing the Transaction.

161. The JOHNSONS are the Subclass Representatives as to Count IX (hereinafter referred to as the "Financing Subclass") which is defined as: All individuals who otherwise meet the definition of the Class set forth in Paragraph 159 AND obtained financing in connection with the Transactions and have made payments under the terms and conditions of their financing agreements directly or indirectly to ZEALANDIA or any of its subsidiaries or affiliated entities since September 30, 2011.

**The Class and Subclasses are so Numerous that Joinder of All Members is Impracticable.**

162. Upon information and belief, there are at least 900 proposed class members.  As of July 9, 2012, ZEALANDIA claimed there were "more than 11,000 Festiva Orlando Resort owners," so the exact number of class members is undetermined.  See Exhibit "31."

163. It is impractical to join all proposed class members to this action as even 900 proposed class members is too numerous.

164. Plaintiffs and their counsel are unaware at this time how many members fit into the RICO Subclass and the Financing Subclass, however CWRM, LTD. offered financing for the Fraudulent Transactions in its ordinary course of business and established a "telemarking department" to offer, sell, advertise, solicit, induce, and close the Fraudulent Transactions.

165. Since membership into both Subclasses is conditioned on acts and practices involving CWRM, LTD.'S ordinary course of business with respect to inducing Owners into the Fraudulent Transactions, joinder of all parties will be impracticable.

**There Are Questions of Law and Fact Common to the Proposed Class.**

166. Plaintiffs and the proposed class members all have the same legal and factual relationship with all Defendants and their subsidiaries and affiliated entities.

167. Each and every Defendant has engaged in a standardized course of conduct relating to all material acts, practices, and omissions regarding Plaintiffs and the proposed class members' Fraudulent Transactions and Points.

168. All members of the proposed class were harmed in identical ways by identical acts and omissions of the several Defendants.

169. At all material times hereto, the Declaration and Timeshare Act have defined the legal rights obligations and duties of Defendants and all members of the proposed class.

170. Since CS CWR Holdings acquired the Resort, it became the "Successive Developer" of the Timeshare Plan pursuant to Article 1, Paragraph O of the Declaration and  Fla. Stat. § 721.05(10).

171. Since Festiva Development has acquired CS CWR Holdings, ZEALANDIA has been in charge of the Timeshare Plan and all facets of managing the Resort.

172. At all material times hereto, the ASSOCIATION has been subject to the Declaration, as it is a covenant running with the land.

173. While the Fraudulent Transactions were being entered into, B.L. was the "Developer" of the Resort as identified in the Declaration and had a duty to supervise all aspects of offering the Timeshare Plan pursuant to Fla. Stat. § 721.056.

174. Plaintiffs and the proposed class members all entered into their Fraudulent Transactions with CWRM, LTD. and RCI.

175. Plaintiffs and the proposed class were all fraudulently induced into becoming members of RCI'S "Exchange Program."

176. At all material times hereto, RCI was an "Exchange Company" as defined by Fla. Stat. § 721.05(16).

177. At all material times hereto, RCI provided through its Points system an "Exchange Program" as defined by Fla. Stat. § 721.05(17).

178. At all material times hereto, RCI was subject to Fla. Stat. §§ 721.18 and 501.204.

179. Plaintiffs and the proposed class members owned Deeds representing their interest in the Resort and participation in the Timeshare Plan.

180. By virtue of Plaintiffs and the proposed class members owning Deeds, they were afforded the rights, protections, and duties afforded to them in the Declaration, as it is a covenant running with each and every property within the Timeshare Plan.

181. By virtue of owning Deeds within the Resort, Plaintiffs and the proposed class members are entitled to enforce the terms of the Declaration.

182. At all times material hereto, Plaintiffs and the proposed class members were "Purchasers" within the definition of Fla. Stat. § 721.05(30) and "Owners" within the definition Article I. Paragraph V. of the Declaration, and are thereby provided all protections afforded to therein.

**The Class and Subclass Representatives have Claims Typical of the Proposed Class and Subclass Members.**

183. The PLEVRAKISES, REEVES, and JOHNSONS' claims for relief are based on the same legal principles and theories arising from the same events and practices of the several Defendants.

184. Defendants' common course of conduct with respect to Plaintiffs and the proposed class members renders the claims typical.

185. The interests of the proposed class members' are not placed in jeopardy by virtue of the Class Representatives' claims for relief because common issues of law and fact govern Plaintiffs and the proposed class members' claims and requests for relief.

**The Class Representatives Will Fairly and Adequately Protect the Interests of the Proposed Class.**

186. The Class Representatives can fairly and adequately represent the proposed class because they all have the same interests and have been harmed by the several Defendants' conduct and omissions.

187. Neither Plaintiffs nor the proposed class members have received any benefit, economical or otherwise, from the several Defendants' conduct and omissions.

188. The Class Representatives do not have opposing or conflicting interests with the proposed class members.

**Class Counsel Will Fairly and Adequately Represent the Interests of the Proposed Class.**

189. The Finn Law Group, P.A. has represented approximately one-thousand (1,000) Timeshare Owners with respect to their Timeshare Interests.

190. The Finn Law Group has represented Timeshare Owners in numerous lawsuits against various Developers involving issues including but not limited to:

    a.  Contract Disputes;

    b.  Violations of the Timeshare Act;

    c.  Declaration Violations;

    d.  Breach of Fiduciary Duty;

    e.  Fraud;

    f.  Fraud in the Inducement of Contract;

    g.  Negligent Misrepresentation;

    h.  Negligent Supervision;

    i.  Violations of Florida's Consumer Collection Practices Act;

    j.  Violations of Florida's Deceptive and Unfair Trade Practices Act;

    k.  Violations of the Federal Fair Debt Collection Practices Act; and

      l.   Violation of the Fair Credit Reporting Act;

191. Shannon Zetrouer (Zetrouer) has been lead counsel on each and every lawsuit the Finn Law Group has represented Timeshare Owners in.

192. Zetrouer is "Of Counsel" to the Finn Law Group, P.A. and a partner at the law firm of Westerman White Zetrouer, P.A.(hereinafter referred to as "WWZ"),

193. In her capacity at WWZ, Zetrouer has been lead counsel on numerous lawsuits including but not limited to:

    a.   Representing Condominium and Homeowners' Associations in actions and disputes arising out of Declaration Enforcement;

    b.   Litigating disputes involving real estate transactions;

    c.   Litigating disputes involving contractual obligations;

    d.   Litigation disputes on behalf of a class in a class action context;

    e.   Litigating on behalf of timeshare owners in matters concerning their timeshares;

    f.   Litigating claims involving the Timeshare Act;

    g.   Litigating claims involving deceptive and unfair trade practices;

    h.   Litigating claims involving fraud; and

    i.   Litigating claims involving breaches of fiduciary duty.

**The Questions of Law or Fact Predominate Over Any Potential Individual Issues.**

194. Predominance is established because if any Defendant is found liable to Plaintiffs they will be liable to members of the proposed Class and/or Subclasses.

195. Defendants engaged in a common course of conduct that affected Plaintiffs and the proposed class members equally.

196. CWRM, LTD. and RCI perpetrated a scheme on Plaintiffs and the proposed class members by the use of identical written misrepresentations contained in their Participation Agreements, and all harm that the several entities inflicted at all material times to this action has flowed from their standardized conduct.

197. Holding Defendants liable on Plaintiffs' claims will have a direct impact on every class member's effort to establish Defendants' liability.

**The Proposed Class Members are Readily Ascertainable.**

198. The proposed class members purchased a Timeshare Interest at the Resort.

199. RCI removed or adjusted Points in the Accounts individually; therefore its internal records will contain the identity of each and every proposed class member.

200. The ASSOCIATION'S books and records will have a list of all Owners and contain information regarding the identity of the proposed class members. See Exhibits "32" and "34."

201. ZEALANDIA and PATTON HOSPITALITY have already conducted "account audits" and "request[ed] RCI" to adjust the proposed class members Accounts. See Exhibit "32."

202. Since ZEALANDIA, PATTON HOSPITALITY, the ASSOCIATION, and RCI had to review the Accounts on an individual basis, their records are available to ascertain the class members.

203. Members of the RICO Subclass are readily ascertainable through a review of CWRM, LTD.'S business records pertaining to the advertising and offering of the Fraudulent Transactions. Additionally, upon information and belief, many members of the Proposed RICO Subclass have retained an e-mail describing the terms of the Fraudulent Transactions, virtually identical as the correspondence sent to the REEVES. See Exhibit "13."

204. Members of the Financing Subclass are readily ascertainable through are review of ZEALANDIA'S records (and its affiliated entities and subsidiaries) identifying the date and amounts of payments furnished and accepted under the financing agreements.

**A Class Action is Superior to Other Available Methods for Fairly and Efficiently Adjudicating the Controversy.**

205. Due to the number of proposed class members and number of Defendants, joinder of all proposed class members is unreasonable and hundreds or perhaps thousands of separate lawsuits regarding identical factual circumstances and legal issues would burden the Court and the several Defendants.

206. Given the nature of the issues involved in this lawsuit and a finding that the other requirements for class certification having been met, a class action lawsuit is the fairest and most efficient manner to adjudicate this controversy.

## COUNT I- FLORIDA COMMON LAW FRAUD IN THE INDUCEMENT OF CONTRACT AGAINST  CWRM, LTD. AND B.L.

207.   Plaintiffs hereby re-allege all previous allegations one (1) through eighty (80), one hundred three (103) through one hundred fourteen (114), one hundred fifty-nine (159), and one hundred sixty-two (162) through two hundred six (206), as though fully set forth herein.

208.   As the Resort's "Developer" during the timeframe CWRM, LTD. was offering, promoting, advertising, contracting for, and closing the Fraudulent Transactions, B.L. is liable for CWRM. LTD.'S tortious and illegal conduct with respect to these activities pursuant to Fla. Stat. § 721.056.

209.   A material element of the Fraudulent Transactions was CWRM, LTD. offering and selling Plaintiffs and the proposed class members a drastically inflated amount of RCI Points in connection with the Timeshare Interest sold and "deposited" into RCI's "Spacebank" as part of the Fraudulent Transactions.

210.   The amount of RCI Points Plaintiffs and the proposed class members received in connection with their Fraudulent Transactions was a material fact to the Fraudulent Transactions in existence when the offers were made and accepted, and when the Fraudulent Transactions were executed and ratified.

211.   It is inconceivable for CWRM, LTD. not to have known: (1) it could only sell RCI Points that matched the appropriate "value" RCI assigned the Timeshare Interests it was selling and (2) that it had no contractual or legal right to sell, market, and provide Purchasers Points in excess of the Timeshare Interest's assigned "value."

212.   Having full knowledge of the nature, benefits, and value of RCI Points, CWRM, LTD. used the inflated Point values to induce Plaintiffs and the proposed class members to enter into the Fraudulent Transactions.

213.   The written documents completed and executed at the time of *each and every Fraudulent Transaction*, including but not limited to the RCI Participation Agreements, Sales Contracts, RCI Points Summaries, Deeds, and Financing Agreements are all *written conclusive evidence* that CWRM, LTD. sold Plaintiffs and the proposed class members

26

RCI Points in excess of their assigned "value" established by RCI *prior to the Fraudulent Transactions*.

214. The fraud occurred at the time the Fraudulent Transactions were offered and completed.

215. The fraud was perpetrated by the sales representatives and individuals employed or acting on behalf of CWRM, LTD. as part of the execution and closing of each and every Fraudulent Transaction.

216. Plaintiffs and the proposed class members entering into the Fraudulent Transactions by executing all necessary documents to purchase a Timeshare Interest and enroll into the RCI Exchange Program is indisputable proof that they relied on the *false facts in the written misrepresentations representations* that all material terms of the Fraudulent Transaction were true and valid.

217. As a direct and proximate result of CWRM, LTD. inducing Plaintiffs and the proposed class members to enter into the Fraudulent Transactions, Plaintiffs and the proposed class members have been damaged by paying good and valuable consideration to purchase RCI Points and not receive the benefit of the RCI Points they purchased. Additionally, Plaintiffs and the proposed class members own a Timeshare Interest, which is Real Property, with a continuing financial obligation in the form of taxes and maintenance fees.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed class defined herein, demand:

> A. This Court enter an order rescinding all contracts, agreements, and financial obligations owed to the several Defendants arising out of and in connection with the Fraudulent Transactions;
>
> B. This Court enter an order permitting Plaintiffs and the proposed class members to fully divest themselves of their Ownership Interest in the Resort;
>
> C. Damages for all amounts paid by Plaintiffs and the proposed class members to CWRM, LTD., B.L., the ASSOCIATION, and RCI prior to, in consideration for, and subsequent to the Fraudulent Transactions;
>
> D. Punitive damages and Court costs;

E.  Find B.L. liable for CWRM, LTD.'S  actions and omissions in offering the Fraudulent Transactions pursuant to Fla. Stat. § 721.056; and

F.  Any further relief this Court deems equitable and proper.

## COUNT II- BREACH OF FIDUCIARY DUTY AGAINST THE ASSOCIATION

218.  Plaintiffs hereby re-allege all previous allegations one (1) through thirty-three (33), fifty-five (55) through eighty (80), one hundred three (103) through one hundred fourteen (114), one hundred thirty-one (131) through one hundred fifty-seven (157), one hundred fifty-nine (159), and one hundred sixty-two (162) through two hundred six (206), as though fully set forth herein.

219.  The ASSOCIATION owes Plaintiffs and the proposed class a fiduciary duty pursuant to Article III. Paragraph E. Section 8 of the Declaration and Fla. Stat. § 721.13(2)(a).

220.  All officers and directors of the ASSOCIATION owe Plaintiffs and the proposed class members a fiduciary duty pursuant to Article XXI Paragraph E of the Declaration.

221.  Upon information and belief, the officers and directors of the ASSOCIATION were also employed with CWRM, LTD. while CWRM, LTD. devised and carried out the scheme to induce Plaintiffs and the proposed class members into the Fraudulent Transactions.

222.  Particularly, Donna Dampier was on the ASSOCIATION'S Board of Directors during the time period of 2004-2009 and was the "Vice President of Operation" at CWRM, LTD. from 2001-2011.  A true and correct copy of Donna Dampier's Resume is attached hereto as Exhibit "35."

223.  Donna Dampier's stated duties show she was aware of every facet of the Resort, including but not limited to handling contracts, sales commissions and bonuses, sales, marketing, and having "experience with RCI." See Exhibit "35."

224.  Upon information and belief, Nina Lupo was on the ASSOCIATION'S Board of Directors from 2007-2008 and for a period of time was also involved in marketing Timeshare Interests for CWRM, LTD.

225.  Upon information and belief, Christina Lopez was on the ASSOCIATION'S Board of Directors in 2009 and was also involved handling and/or processing Contracts between CWRM, LTD. and Owners.

226. Upon information and belief, Helena Darnell was on the ASSOCIATION'S Board of Directors from 2010-2011 and was also employed with CWRM, LTD. in the marketing and sales department.

227. Upon information and belief, Donna Dampier, Nina Lupo, Christina Lopez, and Helena Darnell were aware of and participated in CWRM, LTD. offering and selling existing Owners and individuals who became Owners after they purchased a Timeshare Interest in the Fraudulent Transactions.

228. The ASSOCIATION and its Board of Directors breached their fiduciary duty by having knowledge their Owners and Purchasers were being targeted for Fraudulent Transactions and standing by or participating in it: or in the alternative violated their fiduciary duty by being grossly negligent by not being aware of such a long lasting and prevalent fraudulent scheme.

229. The Fraudulent Transactions involve and pertain to the Timeshare Plan and not just the RCI Exchange Program because a material and essential element of the Fraudulent Transactions required the execution of numerous documents pertaining to the Plan and not just RCI Points, including but not limited to Deeds.  Without the execution of a Deed and each and every document necessary to Purchase a Timeshare Interest, the Fraudulent Transactions could not have occurred.

230. The ASSOCIATION is the same entity it has been since its inception, it merely changed its name after Festiva acquired the Resort.   A true and correct copy of the ASSOCIATION'S Name Change Amendment filed with Florida's Secretary of State is attached hereto as Exhibit "36."

231. Despite being the same entity that violated its fiduciary duty with respect to the allegations contained in this count, the ASSOCIATION has misrepresented its involvement and knowledge of the Fraudulent Transactions by claiming it was not aware of CWRM, LTD.'S fraudulent conduct or the nature of the Fraudulent Transactions.  See Exhibit "34."

232. The ASSOCIATION'S continual misrepresentations, omissions, and lack of candor to Plaintiffs and the proposed class members concerning its role in and knowledge of the Fraudulent Transactions is an ongoing and continuous violation of its fiduciary duty.

233. As a direct and proximate cause of the ASSOCIATION'S knowledge of and complicity of the scheme to induce Plaintiffs into the Fraudulent Transactions, the ASSOCIATION has continually breached its fiduciary duty throughout the entire timeframe the scheme was devised and carried out, resulting in damage to Plaintiffs and the proposed class members by virtue of them being fraudulently induced into the Fraudulent Transactions, not receiving the benefit of what they purchased, not receiving any compensation for the amounts owed, and stuck paying annual maintenance fees for Timeshare Interests that were procured by fraud in the inducement of contract.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed class members, demand:

> A. This Court find the ASSOCIATION has violated its fiduciary duty;
>
> B. Damages for all amounts paid by Plaintiffs and the proposed class members to CWRM, LTD., B.L., the ASSOCIATION, and RCI prior to, in consideration for, and subsequent to the Fraudulent Transactions;
>
> C. Costs and attorneys' fees pursuant to Fla. Stat. § 721.21 and the Declaration; and
>
> D. Any further relief this Court deems equitable and proper.

## COUNT III- VIOLATION OF FLORIDA STATUTE SECTION 501.204, FLORIDA'S DECEPTIVE AND UNFAIR PRACTICES ACT (FDUPTA) AGAINST RCI

234. Plaintiffs hereby re-allege all previous allegations one (1) through thirty-three (33), fifty-five (55) through eighty (80), one hundred three (103) through one hundred fourteen (114), one hundred thirty-one (131) through one hundred fifty-seven (157), one hundred fifty-nine (159), and one hundred sixty-two (162) through two hundred six (206), as though fully set forth herein.

235. Florida Statute § 501.204 provides: "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful."

236. RCI Points and the RCI Exchange Program is "trade or commerce" as defined by Fla. Stat. § 501.203(8):

> "Trade or commerce" means the advertising, soliciting, *providing*, offering, or distributing, whether by sale, rental, or otherwise, of *any good or service*, or any property, whether tangible or intangible, or any other article, commodity, or *thing of value*, wherever situated. "Trade or commerce" shall include the conduct of any trade or commerce, however denominated, including any nonprofit or not-for-profit person or activity. (emphasis added).

237. RCI Points and the RCI Exchange Program is a "thing of value" as defined by Fla. Stat. § 501.203(7):

> "Thing of value" may include, without limitation, any moneys, donation, membership, credential, certificate, prize, award, benefit, license, interest, professional opportunity, or chance of winning.

238. Additionally, pursuant to Fla. Stat. § 721.18(5)  "The failure of an exchange company to observe the requirements of this section, or the use of any unfair or deceptive act or practice in connection with the operation of an exchange program, is a violation of this chapter."

239. RCI committed deceptive and unfair acts and practices by accepting Plaintiff and the proposed class members' Enrollments into the RCI Exchange Program when it knew the Point totals it was assigning them, as evidenced on each and every Participation Agreement, exceeded the values RCI had assigned to the corresponding inventory they were "depositing" into the "Spacebank."

240. RCI committed deceptive and unfair acts and practices by assigning and allocating Points to Purchasers "depositing" their Timeshare Interested into the "Spacebank" supposedly from a Resort that does not exist with a purported Resort I.D. of 6731.  See Exhibits "21" and "26."

241. RCI committed deceptive and unfair acts and practices by drastically departing from its own guidelines relating to the "values" advertised to the public.  See Exhibits "7," "8," and "9."

242. RCI'S acceptance and ratification of the Fraudulent Transactions were likely to and did in fact deceive Plaintiffs and the proposed class members into believing the Fraudulent

Transactions were legitimate when RCI ratified the Fraudulent Transactions by accepting fees, accepting the Participation Agreements, and "depositing" Points into Accounts.

243. RCI'S acceptance and ratification of the Fraudulent Transactions were likely to and did in fact deceive Plaintiffs and the proposed class members into believing the Fraudulent Transactions were legitimate because it is responsible for administering the RCI Points Program, and has superior knowledge and sophistication regarding the nature, benefits, and administration of the RCI Points program.

244. RCI has committed unfair acts and practices because it has accepted and retained all monetary amounts Plaintiffs and the proposed class members paid it in consideration for the Points which have not been honored, including but not limited to fees paid at the time of the Fraudulent Transactions and subsequent fees and annual charges.

245. If RCI had not accepted and ratified the Fraudulent Transactions, Plaintiffs and the proposed class members would not have been harmed.

246. RCI'S conduct at all material times to this action is unfair because it accepted and ratified the Participation Agreements, received good and valuable consideration for the same, and subsequently refused to honor Points *it approved and allocated* without refunding any amounts received or providing any other forms of compensation.

247. RCI'S conduct at all material times to this action is unconscionable because it accepted the Fraudulent Transactions as valid and then refused to honor them or otherwise compensate Plaintiffs and the proposed class members when it subsequently refused to honor the Point totals contained in their Participation Agreements.

248. As a direct and proximate result of RCI's unconscionable, unfair, and deceptive acts and practices, Plaintiffs and the proposed class were deprived of the Points for which they paid, and have been damaged as a natural consequence of the same.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed class members, demand:

> A. This Court enter an order rescinding all contracts, agreements, and financial obligations owed to RCI arising out of and in connection with the Fraudulent Transactions;

B.  Damages of all monetary amounts Plaintiffs and the proposed class members have paid to RCI prior to, in consideration for, and subsequent to the Fraudulent Transactions;

C.  Costs and attorneys' fees pursuant to Fla. Stat. § 501.2105; and

D.  Any further relief this Court deems equitable and proper.

## COUNT IV- CIVIL CONSPIRACY TO COMMIT (1) FLORIDA COMMON LAW FRAUD IN THE INDUCEMENT OF CONTRACT, (2) BREACH OF FIDUCIARY DUTY, AND (3) VIOLATION FLORIDA STATUTE SECTION 501.204 AGAINST RCI, THE ASSOCIATION, CWRM, LTD., AND B.L.

249.  Plaintiffs hereby re-allege all previous allegations one (1) through eighty (80), one hundred three (103) through one hundred fourteen (114), one hundred fifty-nine (159), and one hundred sixty-two (162) through two hundred twenty-nine (229), and two hundred thirty-four (234) through two hundred forty-eight (248), as though fully set forth herein.

250.  Under various agreements and documents, RCI, the ASSOCIATION, and CWRM, LTD. are separate and distinct entities. See Exhibit "10," Paragraph 5.2.2 and Exhibit "11," Paragraph 21,D i-iii.

251.  As the Resort's "Developer" during the timeframe CWRM, LTD. was offering, promoting, advertising, contracting for, and closing the Fraudulent Transactions, B.L. is liable for CWRM. LTD.'S tortious and illegal conduct with respect to these activities pursuant to Fla. Stat. § 721.056.

252.  Despite Affiliated Resorts having the authority to market and sell RCI memberships and the Points appurtenant thereto, RCI reserves the right to accept or reject a Purchaser's Membership Application and is solely responsible for administrating Owners' Accounts.

253.  By RCI accepting and ratifying Plaintiffs and the proposed class members' Participation Agreements, RCI continually encouraged and permitted CWRM, LTD. to perpetrate its fraudulent scheme.

254.  RCI, the ASSOCIATION, and CWRM, LTD. must all consent and ratify various steps in a Fraudulent Transaction that endeavors to (1) sell RCI Points and membership into the RCI Exchange Program, (2) the sale and closing of a Timeshare Interest, (3) "depositing" the purchased Timeshare Interest into the "Spacebank," and (4) "depositing" Points into

Owners' Accounts by executing the numerous documents a Purchaser must sign to complete the purchase of a Timeshare Interest.

255. RCI, the ASSOCIATION, and CWRM, LTD. executed documents in connection with the Fraudulent Transactions, including but not limited to Deeds, RCI Participation Agreements, Contracts for Sale, financing agreements, and closing documents.

256. The underlying tortious conduct giving rise to this conspiracy includes, but is not limited to:

a. CWRM, LTD. fraudulently inducing Plaintiffs into the Fraudulent Transactions;

b. The ASSOCIATION violating its fiduciary duty; and

c. RCI violating Fla. Stat. §§ 501.204 and 721.18(5) by committing unfair and deceptive acts and practices in the operation of its Exchange Program.

257. The overt acts performed in furtherance of this Conspiracy include but are not limited to *events preceding and at the time of* the Fraudulent Transactions:

a. CWRM, LTD. contacting Plaintiffs and the proposed class members to offer the Fraudulent Transactions;

b. CWRM. LTD. selling Plaintiffs and the proposed class members inflated Point values;

c. CWRM. LTD. and the ASSOCIATION inducing Plaintiffs and the proposed class members to purchase a Timeshare Interest and sign all necessary documentation associated with the sale and closing;

d. RCI accepting Plaintiffs and the proposed class members' Participation Agreements with patent false written representations contained therein, accepting payments from Plaintiffs and the proposed class members, allocating the Point amounts contained in the Participation Agreements, and subsequently refusing to honor the Point totals it previously approved; and

e. CWRM LTD. and RCI accepting and keeping all monetary amounts paid by Plaintiffs and the proposed class in consideration for the terms of the Fraudulent Transactions.

258. Plaintiffs and the proposed class members have been directly and proximately damaged by the overt acts performed by RCI, the ASSOCIATION, and CWRM, LTD. because they paid good and valuable consideration for their Points and have not been provided with the benefit of the bargain.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed class members, demand:

A. This Court find RCI, THE ASSOCIATION, and CWRM, LTD. jointly and severally liable for all damages, including punitive damages, to Plaintiff and the proposed class members arising from (1) CWRM, LTD. fraudulently inducing Plaintiffs and the proposed class members into the Fraudulent Transactions, (2) the ASSOCIATION violating its fiduciary duty, and (3) RCI violating Fla. Stat. § 501.204;

B. Find B.L. liable for CWRM, LTD.'S actions and omissions comprising of this Count;

C. This Court enter an order rescinding all contracts, agreements, and financial obligations owed to the several Defendants arising out of and in connection with the Fraudulent Transactions;

D. Costs and attorneys' fees pursuant to the Declaration, Fla. Stat. § 721.21, and Fla. Stat. § 501.2105; and

E. Other relief this Court deems equitable and proper.

## COUNT V- VIOLATION OF 18 U.S.C. 1962(a) (FEDERAL RICO STATUTE) AGAINST CWRM, LTD. AND B.L.

259. Plaintiffs hereby re-allege all previous allegations one (1) through one hundred two (102), one hundred fifty-nine (159) through one hundred sixty (160), and one hundred sixty-two (162) through two hundred six (206), as though fully set forth herein.

260. As part of CWRM. LTD. and RCI'S scheme to sell the REEVES and the proposed subclass members the Fraudulent Transactions, CWRM, LTD. established a telemarketing center, at the Resort, to contact existing Owners and prospective Purchasers, many of whom were located outside the State of Florida.

261. As the Resort's "Developer" during the timeframe CWRM, LTD. was offering, promoting, advertising, contracting for, and closing the Fraudulent Transactions, B.L. is liable for CWRM. LTD.'S tortious and illegal conduct with respect to these activities pursuant to Fla. Stat. § 721.056.

262. Additionally, CWRM, LTD. sent many Owners e-mail communications detailing the terms of the Fraudulent Transactions. See Exhibits "13" and "14."

263. Using telephone and e-mail communications to devise or intend to devise a scheme to defraud in interstate or foreign commerce is Wire Fraud in violation 18 U.S.C. § 1343.

264. Upon information and belief, CWRM, LTD. mailed from Florida via the U.S. Postal Service, or other private or commercial interstate carriers, documents to targets of the scheme (located outside the State of Florida) to sign in connection with the Fraudulent Transactions. The documents include but are not limited Deeds, RCI Participation Agreements, and Contracts for Sale.

265. Using the Postal Service, or other private carriers, in interstate or foreign commerce to devise or intend devise a scheme to defraud is Mail Fraud in violation 18 U.S.C. § 1341.

266. Mail Fraud and Wire Fraud are RICO predicate acts as they are included in the definition of "racketeering activity" as defined in 18 U.S.C. § 1961(1)(B).

267. CWRM, LTD. is a "person" as defined by 18 U.S.C. § 1961(3) because it is an "entity" capable of holding legal and beneficial interests in property.

268. CWRM, LTD.'S activity constitutes a "pattern of racketeering activity" because the Fraudulent Transactions were sold to at least 900 Purchasers from at least 2005-2011.

269. CWRM, LTD. violated 18 U.S.C. § 1962(a) by intentionally receiving and obtaining proceeds obtained in connection with each and every Fraudulent Transaction sold to Plaintiffs and the proposed class members.

270. The REEVES and the proposed subclass members have been directly and proximately damaged by being fraudulently induced into the Fraudulent Transactions as they were targeted through telephones, e-mail, the Postal Service, and other private carriers to enter into the Fraudulent Transactions.

**WHEREFORE**, the REEVES, on behalf of themselves and the proposed subclass members, demand:

A. Award the REEVES and the proposed subclass members treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1962(c);

B. Find B.L. liable for CWRM, LTD.'S violations pursuant to Fla. Stat. § 721.056; and

C. Any further relief this Court deems equitable and proper.

## COUNT VI- VIOLATION OF 18 U.S.C. 1962(d) (FEDERAL RICO STATUTE) AGAINST CWRM, LTD., THE ASSOCIATION, RCI, AND B.L.

271. Plaintiffs hereby re-allege all previous allegations one (1) through one hundred two (102), one hundred fifty-nine (159) through one hundred sixty (160), one hundred sixty-two (162) through two hundred six (206), and two hundred fifty-nine (259) through two hundred seventy (270), as though fully set forth herein.

272. RCI, the ASSOCIATION, and CWRM, LTD.  violated 18 U.S.C. § 1962(d) by conspiring and devising the scheme to sell the Fraudulent Transactions by using telephones, e-mail, the Postal Service, and other private carriers to target Purchasers located outside the State of Florida.

273. As the Resort's "Developer" during the timeframe CWRM, LTD. was offering, promoting, advertising, contracting for, and closing the Fraudulent Transactions, B.L. is liable for CWRM. LTD.'S tortious and illegal conduct with respect to these activities pursuant to Fla. Stat. § 721.056.

274. CWRM, LTD. violated 18 U.S.C. § 1962(a) by carrying out the scheme to fraudulently induce the Purchasers into the Fraudulent Transactions by using telephones, e-mail, the Postal Service, and other private carriers to target existing Owners and prospective Purchasers located outside the State of Florida.

275. In furtherance of the conspiracy to sell the Fraudulent Transactions, CWRM, LTD. committed Mail Fraud and Wire Fraud to induce the REEVES and the proposed subclass members to enter into the Fraudulent Transaction.

276. In furtherance of the conspiracy to sell the Fraudulent Transactions, CWRM, LTD. established a telemarketing center to contact existing Owners and prospective Purchasers located throughout the United States and in foreign countries.

277. In furtherance of the conspiracy, RCI accepted and ratified the Fraudulent Transactions procured through the Mail Fraud and Wire Fraud by accepting the REEVES and the proposed subclass members' Participation Agreements and retaining all amounts paid.

278. In furtherance of the conspiracy, the ASSOCIATION permitted CWRM, LTD. to commit Timeshare Interests to RCI that are "owned by or otherwise available for use by the Association."  See Exhibit "34."

279. The REEVES and the proposed subclass members have been directly and proximately damaged by CWRM, LTD., the ASSOCIATION, and RCI'S scheme to sell the Fraudulent Transactions through telephones, e-mail, the Postal Service, and other private carriers.

**WHEREFORE**, the REEVES, on behalf of themselves and the proposed subclass members, demand:

> A.   Find CWRM, LTD., the ASSOCIATION, and RCI jointly and severally liable for CWRM, LTD.'S violation of 18 U.S.C. § 1962(a);
>
> B.   Award the REEVES and the proposed subclass members treble damages, costs, and attorneys' fees pursuant to 18 U.S.C. § 1962(c);
>
> C.  Find B.L. liable for CWRM, LTD.'S violations pursuant to Fla. Stat. § 721.056; and
>
> D.  Any further relief this Court deems equitable and proper.

## COUNT VII- BREACH OF FIDUCIARY DUTY AGAINST PATTON HOSPITALITY

280. Plaintiffs hereby re-allege all previous allegations one (1) through thirty-three (33), seventy-two (72) through eighty (80), one hundred three (103) through one hundred fourteen (114), one hundred thirty-one (131) through one hundred fifty-seven (157), one hundred fifty-nine (159), one hundred sixty-two (162) through two hundred six (206), and two hundred eighteen (218) through two hundred thirty-three (233), as though fully set forth herein.

281. By virtue of signing a management agreement, PATTON HOSPITALITY became the "managing entity" of the Timeshare Plan pursuant to Fla. Stat. §  721.13(b)(2).

282. Pursuant to Fla. Stat. § 721.13(2)(a), PATTON HOSPITALITY owes the Owners of the Timeshare Plan a fiduciary duty as the "managing entity."

283. As long as PATTON HOSPITALITY has a management contract with the ASSOCIATION, both entities are considered to be the "managing entity" and are jointly and severally responsible for the faithful discharge of the duties of the managing entity pursuant to Fla. Stat. § 721.13(1)(b)(2).

284. PATTON HOSPITALITY has breached its fiduciary duty by misrepresenting the ASSOCIATION'S knowledge of and complicity in the scheme to sell the Fraudulent Transactions.  See Exhibits "32" and "34."

285. PATTON HOSPITALITY has breached its fiduciary duty by putting the financial needs of the Resort and the ASSOCIATION before the well-being of the Owners.  See Exhibits "32" and "34."

286. PATTON HOSPITALITY is responsible for each and every act, statement, and omission performed by the ASSOCIATION that constitutes a violation of its fiduciary duty since it entered into a management contract with the ASSOCIATION by virtue of Fla. Stat. § 721.13(1)(b)(2).

287. As a direct and proximate result of PATTON HOSPITALITY breaching the fiduciary owed to Plaintiffs and the proposed class members, they have been damaged by continually being misled regarding the nature, extent, and the parties responsible and having knowledge of the Fraudulent Transactions.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed class members, demand:

    A.  This Court find PATTON HOSPITALITY it has breached its fiduciary duty owed to Plaintiffs and the proposed class members;

    B.  Find PATTON HOSPITALITY jointly and severally liable for the all actions, statements, and omissions of the ASSOCIATION that constitutes a violation of the ASSOCIATION'S fiduciary duty since the date PATTON HOSPITALITY executed a management agreement with the ASSOCIATION;

    C.  Attorneys' fees and costs pursuant to the Declaration and Fla. Stat. § 721.21; and

    D.  Any further relief this Court deems equitable and proper.

**COUNT VIII- CIVIL CONSPIRACY TO VIOLATE FLORIDA STATUTE
SECTION 501.204 AGAINST RCI, THE ASSOCIATION, CWRM, LTD., B.L.
AND ZEALANDIA**

288. Plaintiffs hereby re-allege all previous allegations one (1) through eighty (80), one hundred three (103) through one hundred fourteen (114), one hundred thirty-one (131) through one hundred fifty-seven (157), one hundred fifty-nine (159), one hundred sixty-two (162) through two hundred six (206), as though fully set forth herein.

289. As the Resort's "Developer" during the timeframe CWRM, LTD. was offering, promoting, advertising, contracting for, and closing the Fraudulent Transactions, B.L. is liable for CWRM. LTD.'S tortious and illegal conduct with respect to these activities pursuant to Fla. Stat. § 721.056.

290. ZEALANDIA is responsible for the actions, statements, and omissions of Festiva Development, CS CWR Holdings, and PATTON HOSPITALITY, as they all operate as its "alter ego" with respect to the collective entities' acquiring and performing the development and management responsibilities of the Resort on or about September 30, 2011.

291. The underlying wrong forming the basis of this conspiracy is RCI'S ongoing and continuous unconscionable, unfair, and deceptive acts and practices while in the operation of an Exchange Program in violation of Fla. Stat. § 501.204.

292. Specifically, ZEALANDIA, the ASSOCIATION, RCI, and CWRM, LTD. all played a significant and material role in the acts and practices of selling Plaintiffs and the proposed class members Points that were subsequently not honored without any refund or compensation provided.

293. The overt acts done in furtherance of this conspiracy performed are;

   a. CWRM, LTD. offering and selling the Fraudulent Transactions;

   b. RCI accepting and ratifying the Fraudulent Transactions;

   c. RCI retaining money paid directly to it by Plaintiffs and the proposed class members in consideration for and subsequent to the Fraudulent Transactions;

   d. The ASSOCIATION permitting CWRM, LTD. to provide "inventory" it owned or had available to RCI necessary to complete the Fraudulent Transactions. See Exhibits "32" and "34";

e. ZEALANDIA, through its subsidiaries and affiliated entities, instructing or requesting RCI no longer honor the purchased Points.  See Exhibit "32.";

f. ZEALANDIA and its subsidiaries and affiliated entities retaining money paid to it by Plaintiffs and the proposed class members in connection with the Fraudulent Transactions; and

g. RCI deleting existing Points and refusing to honor future Point allocations bought and paid for by Plaintiffs and the proposed class members.

294. RCI's conduct at all material times hereto is unconscionable, unfair, and deceptive, because it ratified the Fraudulent Transactions, accepted proceeds from Plaintiffs and the proposed class members, and enabled CWRM, LTD. to perpetrate the scheme to sell the increased Points for approximately 7 years.  RCI now refuses to honor the Point totals it previously ratified and approved while refusing to offer or provide Plaintiffs and the proposed class members any refund or any compensation for the deprivation of their Points, which RCI has the sole responsibility to administer.

295. As a direct and proximate result of CWRM, LTD., ZEALANDIA, the ASSOCIATION, and RCI committing affirmative acts permitting RCI to commit unfair acts and practices with respect to its Exchange Program, Plaintiffs and the proposed class members have been damaged.

**WHEREFORE**, Plaintiffs, on behalf of themselves and the proposed class members, demand:

A.  This Court find CWRM, LTD., the ASSOCIATION, and RCI jointly and severally liable for RCI'S violation of Fla. Stat. §501.204;

B.  Find B.L. liable with CWRM, LTD. actions and omissions pursuant to Fla. Stat. § 721.056;

C.  This Court enter an order rescinding all contracts, agreements, and financial obligations owed to the several Defendants arising out of and in connection with the Fraudulent Transactions;

D. Damages in all monetary amounts Plaintiffs and the proposed class members have paid to RCI, the ASSOCIATION, CWRM, LTD., and ZEALANDIA prior to, in consideration for, and subsequent to the Fraudulent Transactions;

E.  Costs and attorneys' fees pursuant to Fla. Stat. § 501.2105 and;

F.  Any further relief this Court deems equitable and proper.

## COUNT IX- FLORIDA COMMON LAW UNJUST ENRICHMENT AGAINST ZEALANDIA

296.  Plaintiffs hereby re-allege all previous allegations one (1) through thirty-three (33), one hundred fifteen (115) through one hundred fifty-seven (157), and one hundred fifty-nine (159), and one hundred sixty-one (161) through two hundred six (206), as though fully set forth herein.

297.  CWRM, LTD. offered the JOHNSONS and the proposed subclass members financing options in connection with the Fraudulent Transactions.

298.  ZEALANDIA purchased the "loan receivables" in connection with their acquisition of the Resort.  See Exhibit "31."

299.  ZEALANDIA is responsible for the actions, statements, and omissions of Festiva Development and CS CWR Holdings, as they all operate as its "alter ego" with respect to the collective entities' acquiring and performing the development and management responsibilities of the Resort on or about September 30, 2011.

300.  Since acquiring the Resort, the JOHNSONS and the proposed subclass members have been paying ZEALANDIA, Festiva Development, and/or CS CWR Holdings the amounts owed under the terms of their financing agreements.

301.  ZEALANDIA has retained and accepted the proceeds of the "loan receivables" despite the fact that it is acknowledging the Fraudulent Transactions were not valid.

302.  The JOHNSONS and the proposed subclass members, ZEALANDIA, and the ASSOCIATION (which is controlled by ZEALANDIA by virtue of it appointing its Board of Directors at its sole discretion) have all acknowledged the Fraudulent Transactions were invalid or fraudulent.  See Exhibits "32" and "34."

303.  ZEALANDIA has refused to honor the principal consideration the purchasers paid for the Fraudulent Transactions.  See Exhibit "32."

304.  ZEALANDIA is not in privity of contract with Plaintiffs and the proposed class members with respect to amounts it has retained and received in connection with the Fraudulent Transactions and therefore the JOHNSONS and the proposed subclass members are

without an adequate remedy at law under a contract to recover the benefits they have conferred.

305. It is inequitable for ZEALANDIA to continually retain the benefits of the "loan receivables" while refusing to honor the principal consideration the Owners paid CWRM, LTD. in consideration for the Fraudulent Transactions.

**WHEREFORE**, the JOHNSONS, on behalf of themselves and the proposed subclass members, demand:

> A.  This Court enter an order rescinding all contracts, agreements, and financial obligations owed to ZEALANDIA, its subsidiaries and affiliated entities arising out of and in connection with the Fraudulent Transactions;
>
> B.  This Court enter an order permitting Plaintiffs and the proposed class members to fully divest themselves of their Ownership Interest in the Resort; and
>
> C.  This Court enter an order requiring ZEALANDIA, its subsidiaries and affiliated entities, refund in full (plus pre-judgment interest, incidental, and consequential damages) all amounts Plaintiffs and the proposed subclass members have furnished directly or indirectly to them on the financing agreements obtained in the Fraudulent Transactions.

## DEMAND FOR JURY TRIAL

306. Plaintiffs hereby demand a trial by jury on all counts and issues triable by jury.


Dated: June 11, 2013.

_____/s Shannon Zetrouer_____
Shannon Zetrouer, Esquire
Fla. Bar No. 16237
Of Counsel, Finn Law Group, P.A.
146 2nd St. N., Ste. 100
St. Petersburg, Florida   33701
Telephone- 727/329-8956
Facsimile- 727/329-8960
Primary E-mail: szetrouer@wwz-law.com
Secondary: tpulsifer@wwz-law.com
and emoyse@wwz-law.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 11th day of June, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF which will send a notice of electronic filing to all counsel of record.

<u>    /s/ Shannon L. Zetrouer, Esq.        </u>
Shannon L. Zetrouer, Esquire