UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

DAVID REEVES, BILLIE REEVES,
ALLISON PLEVRAKIS, AMPHON
JOHNSON, ALFREINO JOHNSON and
ANASTASIOS PLEVRAKIS,

       Plaintiffs,

v.                                     Case No: 6:13-cv-597-Orl-28TBS

ZEALANDIA HOLDING COMPANY, INC.,
RCI, LLC, B.L.VACATION OWNERSHIP,
INC., CELEBRATION WORLD RESORT
MARKETING, LTD, PATTON
HOSPITALITY MANAGEMENT, LLC and
FESTIVA ORLANDO RESORT
HOMEOWNERS ASSOCIATION, INC.,

       Defendants.

_____

## REPORT AND RECOMMENDATION

      Pending before the Court is the Class Representatives' Motion for Final Approval of the Class Action Settlement (Doc. 151), and Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards (Doc. 152). The motions were referred to me and on July 7, 2016, I held a hearing on both matters. Now, for the reasons that follow, I respectfully recommend that the motions be granted.

### I. Background

      Plaintiffs bring this lawsuit on behalf of the purchasers of vacation ownership interests ("VOIs) in the Festiva Orlando Resort, f/k/a Celebration World Resort timeshare resort ("Resort"), located in Osceola County, Florida (Doc. 42). VOIs are deeded, fractional, fee simple ownership interests as tenants in common with the other owners in the Resort (Doc. 134 at 2). The Resort is subject to the Timeshare Act, Chapter 721

Florida Statutes (Id., ¶ 34).

Defendant B.L. Vacation Ownership Inc. ("BL"), was the original "creating developer" of the Resort (Id., ¶ 35). Florida Statute § 721.05(10)(a)(1) defines "creating developer" as the "person who creates the timeshare plan." From the inception of the development through about August 4, 2011, Defendant Celebration World Resort Marketing, Ltd. ("Celebration") was the "concurrent developer." (Id., ¶ 36). A "concurrent developer" is "any person acting concurrently with the persons in this subsection with the purpose of offering timeshare interests in the ordinary course of business." FLA. STAT. § 721.05(10)(a)(3). Plaintiffs allege that as developers, BL and Celebration had a legal duty "to supervise, manage, and control all aspects of the offering of a time share plan …." (Id., ¶ 50).

Defendant Festiva Orlando Resort Owners Association, Inc. (the "Association"), is the Resort's mandatory owner's association (Id., ¶ 11). Celebration had the authority to appoint and control the Association's board of directors (Id., ¶ 41). During the relevant period of time, Celebration and the Association were both controlled by Joseph Dahruj (Id., ¶ 42).

Defendant RCI, LLC ("RCI") operates an "exchange program." (Id., ¶ 55). Florida Statutes define an "exchange program" as "any method, arrangement, or procedure for the voluntary exchange of the right to use and occupy accommodations and facilities among [VOI] purchasers. The term does not include the assignment of the right to use and occupy accommodations and facilities to purchasers pursuant to a particular multisite timeshare plan's reservation system. Any method, arrangement, or procedure that otherwise meets this definition, wherein the purchaser's total contractual financial obligation exceeds $3,000 per any individual, recurring timeshare period, shall be

regulated as a multisite timeshare plan in accordance with part II." FLA. STAT. §
721.05(16).

BL and Celebration entered into a contractual arrangement with RCI to operate an
exchange program ("Program") for owners and purchasers of VOIs in the Resort (Id., ¶
55). Under the Program, owners deposit their VOIs with RCI in exchange for points that
correspond to the value RCI assigns to the deposited VOIs (Id., ¶¶ 57, 62). The greater
the interest a person has in the Resort, the higher the value of their VOI, and the more
points they receive (Id., ¶ 60). RCI issues a Directory of Affiliated Resorts where points
can be exchanged for vacation time (Id., ¶ 60). Using this system, VOI owners have
greater flexibility to visit other resorts that are associated with RCI (Id., ¶ 56).

The agreement between BL, Celebration and RCI gave Celebration the authority to
promote and sell memberships in the Program (Id., ¶ 65). Plaintiffs allege that dating back
to at least October 2005, Joseph Dahruj and others devised a scheme to sell VOIs to
existing and prospective Resort owners by promising them points that greatly exceeded
the values RCI had established for those VOIs (Id., ¶ 72). With the additional points they
were promised, purchasers could take as many as five additional vacations each year
(Id., ¶ 19). Celebration had no legal right to promise purchasers that if they bought a VOI,
they would receive these additional, excess points (Id., ¶ 16). In order to acquire the
additional points, some class members financed the purchase of VOIs, executing
promissory notes secured by mortgages on their interests (Id., ¶¶ 126-27).

Some class members were induced to pay money in order to exchange their
deeded VOIs for lesser deeded interests in return for the added points (Id.). On average,
Plaintiffs paid $5,000 for inflated, annually accruing point interests Celebration had no
authority to offer or sell (Id., ¶ 32). Despite Celebration's wrongful conduct, RCI accepted

many of these transactions and deposited the inflated points into the owners' accounts (Id., ¶ 20). RCI benefited from these transactions in the form of up-front and ongoing dues, assessments, charges and fees (Id.).

During an unknown period of time, Celebration and related entities borrowed money from Capital Source Finance, LLC ("Capital Source") (Id., ¶ 131). The loans were secured by Celebration's developer rights in the Resort (Id., ¶¶ 132). When Celebration and its related entities defaulted, Capital Source foreclosed (Id., ¶ 133). Once the foreclosure was completed, Capital Source's wholly owned affiliate, CS CWR Holdings, acquired Celebration's development rights (Id., ¶ 134). Later, Festiva Development Group ("FDG") acquired CS CWR Holdings from Capital Source (Id., ¶ 136). FDG is a wholly owned subsidiary of Defendant Zealandia Holding Company, Inc. ("ZHC") (Id., ¶ 137) 139). Through this series of transactions, ZHC obtained operational control of the Resort (Id., ¶ 140). Defendant Patton Hospitality Management, LLC ("PHM") is another wholly owned subsidiary of ZHC which manages the Resort (Id., ¶¶ 144-45). Since it acquired its interest in the Resort, ZHC has been receiving payments on the loans Celebration made to class members to purchase their VOI's (Id., ¶ 142).

After ZHC took control of the Resort, ZHC, PHM and the Association (collectively the "Resort Defendants") notified the class members that the amount of points they had previously purchased from Celebration were excessive, and that RCI had been asked to allocate the correct number of points to each class member's account (Doc. 134 at 5). The result is that the points RCI assigned to the class members have been reduced to reflect the actual values of their VOIs (Id.). Nobody has compensated the class members for the points that were taken from them (Doc. 42, ¶ 25). Now, Plaintiffs complain that they have been deprived of the primary consideration for the purchase of their VOIs (Id., ¶

28). Plaintiffs have brought claims against Defendants for common law fraud, breach of fiduciary duty, violation of the Florida Deceptive and Unfair Trade Practices Act, civil conspiracy, violation of the Racketeer Influenced and Corrupt Organizations Act, and unjust enrichment (Id.).

On September 12, 2013, Plaintiffs, the Resort Defendants, RCI and BL (collectively the "Settling Defendants"), attended mediation (Doc. 95). The case was administratively closed on September 20, 2013, so that the parties could continue mediation (Doc. 97). After more than two years of settlement negotiations, the parties reported that the case had been settled and Plaintiffs filed an unopposed motion for preliminary approval of the class action settlement (Doc. 134). Celebration is not a party to the settlement.

On January 27, 2016, I preliminarily approved the proposed settlement, appointed the named Plaintiffs as class representatives, appointed class counsel, approved and directed the issuance of notice to the class, scheduled a fairness hearing, and established a procedure for the filing of written objections to the proposed settlement (Doc. 137). I preliminarily certified the following class for settlement purposes only:

> All Persons (I) who purchased a Vacation Ownership Interest at the Resort; (2) who, using their VOI, enrolled in the RCI Points Exchange Program; (3) whose RCI Points allocation associated with their VOI at the Resort was reduced by at least 25,000 RCI Points in 2013; and (4) who continue to own their VOI or traded their VOI for a membership in the Festiva Adventure Club.

> Excluded from the Settlement Class are: Defendants; all present or former officers and/or directors of Defendants; Class Counsel; the Judge of this Court and the Judge's family and staff; Defendants' counsel of record; and all persons who make a timely and valid election to be excluded from the Settlement Class in accordance with the provisions of the Notice to the Settlement Class.

(Id. at 2-3).

On July 7, 2016, I held a fairness hearing pursuant to FED. R. CIV. P. 23(e). The only persons who appeared were the attorneys representing Plaintiffs and the Settling Defendants. Almost immediately after the hearing concluded, VOI owners Gary and Tammy Hayes arrived in the courtroom. They did not comment on the record about the proposed settlement but in a letter to the Court, they expressed their view that what has occurred is "extremely unfair," and that they would like "to go back to our original deal we had, and get our money back." (Doc. 160 at 2).

## II. Settlement Agreement

The notice sent to all interested parties summarizes the Settlement Agreement as follows:

There are three (3) categories of benefits, as described further below. Each category of benefit is independent of the other categories.

Cash: B.L. will establish a common fund of $10,000 to be distributed proportionately to each Settlement Class Member who submits a Claim Form. If you elect to be part of the Settlement, you will receive an equal portion of the common fund as all other Settlement Class Members that elect to become part of the Settlement.

RCI Bonus Weeks: RCI will provide Settlement Class Members who complete and timely return a valid Claim Form with one or more RCI Bonus Week(s), depending on the amount of the reduction of RCI Points allocated to each Settlement Class Member's RCI Points account in 2013. RCI Bonus Weeks are a travel credit to use seven (7) consecutive nights of certain inventory available through RCI. Please refer to Question 13 below for more information about the inventory that will be available to eligible Settlement Class Members who use RCI Bonus Weeks.

Settlement Class Members that own a VOI or traded a VOI for a membership in the Festiva Adventure Club and enrolled in the RCI Points Exchange Program in connection with their purchase of VOI (referred to as "Account Holders") will receive between one (1) and three (3) RCI Bonus Weeks based on the following breakdown:

i. Account Holders who had their RCI Points adjusted downwards by more than 200,000 RCI Points in 2013 shall be entitled to three (3) RCI Bonus Weeks that may be used within three (3) years and sixty (60) days from

the date that the Court has formally and finally approved the Settlement and the time for any appeals has expired (referred to as the "Effective Date").

ii. Account Holders who had their RCI Points adjusted downwards by between 100,000 and 200,000 RCI Points in 2013 shall be entitled to two (2) RCI Bonus Weeks that may be used within two (2) years and sixty (60) days of the Effective Date.

iii. Account Holders who had their RCI Points adjusted downwards by between 25,000 and 99,999 RCI Points in 2013 shall be entitled to one (1) RCI Bonus Week that may be used within one (1) year and sixty (60) days of the Effective Date.

An Account Holder can be comprised of more than one Settlement Class Member if he/she jointly owned their VOI and enrolled in the RCI Points Exchange Program. In that instance, the Account Holder will only be entitled to one benefit from RCI.

The use of any RCI Bonus Weeks will be subject to the current Terms and Conditions of RCI Points Subscribing Membership (the "RCI Terms and Conditions"), which can be found on RCI's website at: http://www.rci.com. RCI Bonus Weeks cannot be used after the expiration of the specified time periods.

Vacation Benefits Option or Deed Back Option: You can choose either of the following two (2) options, but not both. Your election to choose either of the two (2) below options does not affect the Cash or RCI Bonus Weeks benefits mentioned above. If you are or become ineligible for either of the two (2) below options, you may still be eligible to partake in the Settlement and receive the Cash and RCI Bonus Weeks mentioned above if you submit a Claim Form.

a.   The Deedback Option.

If you have not exchanged your VOI for membership into the Festiva Adventure Club, you may elect to convey your VOI to ZHC or one of its affiliates by selecting the "Deedback Option" on the Claim Form. After the effective date of the deed conveying your VOI, you will no longer own your VOI, and will not be able to use the VOI to reserve vacations at the Resort or within the RCI Network. Within sixty (60) days of the Effective Date, the Resort Defendants will mail you a deed with instructions on how to execute and return it. The effective date of the conveyance will be no earlier than December 26, 2015, meaning you have all rights and obligations associated with your VOI until then.

To be eligible for the Deedback Option, you must have satisfied any amounts owed under the terms of any promissory notes in connection with the purchase of your VOI. You must also become current on all maintenance fees that have been assessed by the Association (referred to as "Maintenance Fees") up to and through the Association's 2015 budget process. You are not required to pay Maintenance Fees assessed for the Associations 2016 budget or budgets for subsequent years, unless otherwise provided for in this paragraph. However, if you have already paid your 2016

Maintenance Fees, those Maintenance Fees will not be refunded, but you will be eligible to use your VOI for 2016, and the effective date of your deed will be no earlier than December 26, 2016. You are not eligible for the Deedback Option if you owe any amount on a promissory note, even if your note payments are not delinquent; however, you will have a right to cure any deficiencies in Maintenance Fees or promissory note payments without any penalties as explained in Questions 9 and 10 below. If you make reservations utilizing your VOI (either at the Resort or with RCI using RCI Points) during 2016 or any future year(s), you will also have to pay the Maintenance Fees for any year(s) for which you use your VOI.

If you elect the Deedback Option, you will no longer be responsible for paying future Maintenance Fees (with the exception of Maintenance Fees for any future year(s) for which you have used your VOI), and you will have no further rights or obligations owed to the Resort Defendants pertaining to your VOI (except for those provided in this Settlement).

b. *The Vacation Benefit Option.*

If you fill out and return a Claim Form and do not specify that you are electing the Deedback Option, you will automatically receive the Vacation Benefit Option. Under the Vacation Benefit Option, you will receive one or more Certificates, and each Certificate will allow you to book one (1) week (7 consecutive nights) at any PHM - managed resort through a website owned and managed by PHM (currently www.vacationcondos.com).

Under the Vacation Benefit Option, the number of Certificates that you will receive depends on the amount that your RCI Points allocation was reduced:

i. Account Holders who had their RCI Points Account adjusted downward by 25,000-99,999 RCI Points will receive one Certificate, which will entitle them to book one, one-week vacation in their assigned Use Year;

ii. Account Holders who had their RCI Points Account adjusted downward by 100,000–199,999 RCI Points will receive two Certificates, which will entitle them to book two, one-week vacations in their assigned Use Years;

iii. Account Holders who had their RCI Points Account adjusted downward by 200,000-299,999 RCI Points will receive three Certificates, which will entitle them to book three, one-week vacations in your assigned Use Years;

iv. Account Holders who had their RCI Points Account adjusted downward by 300,000–399,999 RCI Points will receive four Certificates, which will entitle them to book four, one-week vacations in their assigned Use Years;

v. Account Holders who had their RCI Points Account adjusted downward by 400,000-499,999 RCI Points will receive five Certificates, which will entitle them to book five, one-week vacations in their assigned Use Years;

vi. Account Holders who had their RCI Points Account adjusted downward by 500,000-599,999 RCI Points will receive six Certificates, which will entitle them to book six, one-week vacations in their assigned Use Years; and

vii. Account Holders who had their RCI Points Account adjusted downward by 600,000-699,999 RCI Points will receive seven Certificates, which will entitle them to seven, one-week vacations in their assigned Use Years.

An Account Holder can be comprised of more than one Settlement Class Member if such Settlement Class Member jointly owned their VOI and enrolled in the RCI Points Exchange Program. In that instance, the Account Holder shall only be entitled to one benefit from the Resort Defendants.

Subject to the right to cure described in Questions 9 and 10 below, eligibility for the Vacation Benefit Option requires that you become and remain current on any promissory note payments (if any), Maintenance Fees, and Festiva Adventure Club payments (if any) through the use of your Certificates.

(Doc. 151-1 at 4-6).

In addition, the Settling Defendants, with the exception of BL, have agreed to pay up to $420,000 to class counsel for attorneys' fees, costs, and expenses, and $1,000 to each named Plaintiff as a service award (Doc. 134-1 at 30-31).

In return, each Plaintiff and settlement class member is deemed to have fully, finally, and forever released and discharged the Settling Defendants, together with their officers, directors, employees, controlling or principal shareholders, partners, affiliates, subsidiaries, insurers, predecessors-in-interest, attorneys, legal representatives, successors and assigns from all claims, debts, and obligations arising out of the reduction of the points, and any other occurrences, conduct or actions that could have been alleged in this action prior to the execution of the Settlement Agreement (Id., at 25-28).

### III. Notice and Responses

Pursuant to my Order granting preliminary approval of the settlement, the Settling Defendants enlisted the services of A.B. Data, Ltd.'s Class Action Administration Company (the "Claims Administrator") to assist in the claims administration process (Doc.

151-1, ¶ 1). The Association provided the Claims Administrator with the names, addresses, and other information for 1,800 settlement class members (the "Settlement Class List"), and a data file that included the names, addresses, and other information for 3,591 persons who, based on the books and records of the Association, purchased VOI's and enrolled in the Program on or before February 11, 2013, and were not otherwise settlement class members (the "VOI Purchaser List") (Id., ¶ 5). The Claims Administrator processed the data through the United States Postal Service National Change of Address database (Id., ¶ 6). Then, on February 29, 2016, the Claims Administrator mailed via USPS First-Class Mail the Notice and Claim Form to the 1,800 persons on the Settlement Class List and sent a Postcard Notice to the 3,591 persons on the VOI Purchaser List (Id., ¶ 7). A total of 153 Notice and Claim Forms were returned marked undeliverable, 37 of which were re-mailed to forwarding addresses (Id., ¶ 8). Of the Postcard Notices, 205 were returned marked undeliverable, 6 of which were re-mailed to forwarding addresses (Id., ¶ 9).

The Claims Administrator established a toll-free helpline to assist persons seeking information about the proposed settlement. The toll-free number was included in the Notice and Postcard Notice (Id., ¶ 10, pp. 11, 27). Both notices informed potential class members that in order to receive any benefit from the settlement, the claimant was required to submit a claim form to the Claims Administrator by May 30, 2016 (Id. at 17, 27). The notices also provided instructions for opting out of the settlement and objecting to the settlement (Id.).

As of June 7, 2016, the Claims Administrator had received 742 claims (Id., ¶ 14). As of June 8, 2016, the Claims Administrator received 7 requests for exclusion and 22 objections to the proposed settlement (Id., ¶¶ 11-12). The Claims Administrator

determined that one objection was from a non-class member, three were untimely, and one was unsigned (Id. at 31). Of the 22 objections, 12 were filed with the Court and 12 were sent to the Claims Administrator (Id.; Docs. 141-50, 155-56). Only 6 objections were timely filed with the Court with a copy sent to the Claims Administrator (Docs. 141-43, 145, 148, 155).

The Claims Administrator also sent notice, pursuant to the Class Action Fairness Act, 28 U.S.C. § 1715(b), to the Attorneys' General of all states in which a potential settlement class member resided (Doc. 151-1, ¶ 4). The Claims Administrator did not receive any objections or correspondence in response to those notices.

## IV. Discussion

### A. Class Certification

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." Gen. Tel. Co. of Sw. v. Falcon, 457 U.S. 147, 161 (1982). Rule 23(a) of the Federal Rules of Civil Procedure establishes four prerequisites to class certification:

> (1) the class is so numerous that joinder of all members is impracticable;
>
> (2) there are questions of law or fact common to the class;
>
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> (4) the representative parties will fairly and adequately protect the interests of the class.

FED. R. CIV. P. 23(a). "These four prerequisites of Rule 23(a) are commonly referred to as 'numerosity, commonality, typicality, and adequacy of representation, and they are designed to limit class claims to those fairly encompassed by the named plaintiffs' individual claims.'" Valley Drug Co. v. Geneva Pharm., Inc., 350 F.3d 1181, 1188 (11th

Cir. 2003) (quoting <u>Prado-Steiman v. Bush</u>, 221 F.3d 1266, 1278 (11th Cir. 2000)).

"Failure to establish any one of these four factors and at least one of the alternative

requirements of Rule 23(b) precludes class certification." <u>Id.</u> (citing <u>Amchem Prods. v.</u>

<u>Windsor</u>, 521 U.S. 591, 615-18 (1997)).

Plaintiffs seek certification pursuant to Rule 23(b)(3), which requires two additional

findings: "that the questions of law or fact common to class members predominate over

any questions affecting only individual members, and that a class action is superior to

other available methods for fairly and efficiently adjudicating the controversy." FED. R. CIV.

P. 23(b)(3).

## B. Approval of the Proposed Class Settlement

Rule 23(e) governs settlements of class actions and imposes the following

applicable procedural safeguards:

> (1) The court must direct notice in a reasonable manner to all
> class members who would be bound by the proposal.
>
> (2) If the proposal would bind class members, the court may
> approve it only after a hearing and on finding that it is fair,
> reasonable, and adequate.
>
> (3) The parties seeking approval must file a statement
> identifying any agreement made in connection with the
> proposal.
>
> . . .
>
> (5) Any class member may object to the proposal if it requires
> court approval under this subdivision (e); the objection may be
> withdrawn only with the court's approval.

FED. R. CIV. P. 23(e).

When I preliminarily approved the settlement, I conditionally found that Rule 23

had been satisfied because: (a) the settlement class is so numerous that joinder of all

members is impracticable; (b) there are questions of law and fact common to the

settlement class; (c) the claims of the named Plaintiffs are typical of the claims of members of the settlement class; (d) the named Plaintiffs and class counsel will fairly and adequately represent the interests of the settlement class; (e) for purposes of settlement only, questions of law and fact common to settlement class members predominate over any questions affecting only individual members; and (f) for purposes of settlement only, certification of the settlement class is superior to other methods for the fair and efficient adjudication of this controversy (Doc.137 at 3).

The Court must now decide whether the settlement agreement is in fact, "fair, reasonable, and adequate." FED. R. CIV. P. 26(e)(2). In making this determination, the Court considers several factors: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of proceedings at which the settlement was achieved." Bennett v. Behring Corp., 737 F.2d 982, 986 (11th Cir. 1984). The Court also considers whether there was any fraud or collusion in arriving at the settlement. Id.

Plaintiffs' likelihood of success at trial is far from certain. This case was evaluated by multiple plaintiff's class action law firms, only one of which was willing to take it on (Hearing). The claims are novel, and premised on Plaintiffs being fraudulently induced by Celebration to purchase VOIs or VOI upgrades based on promises of point allocations in excess of those permitted by the Program. Celebration has not appeared in the case, and none of the Settling Defendants were directly involved in the fraudulent transactions. Plaintiffs allege that RCI was aware of the improper point allocations, but the parties' investigation has revealed that Celebration provided RCI with sufficient vacation weeks to

equal the excessive points promised to the class (Doc. 151 at 7). ZHC and PHM were involved in reducing the point allocations after Celebration's interest was foreclosed, but they were not involved in selling the excess points, and the reductions were made to comply with the Program requirements. It is questionable whether Plaintiffs could prove the transfer of Celebration's developer's rights in the Resort was fraudulent because the developer's rights were conveyed through foreclosure. And, BL played no role in the fraudulent transactions or the reduction of points. Considering these obstacles, and that Plaintiffs were facing multiple motions to dismiss and a likely contested motion for class certification if the case did not settle, I recommend the Court find that Plaintiffs faced significant risks in taking this case to trial.

The risks in succeeding at trial inherently weigh on the range of possible recovery and the point at or below the range of possible recovery at which a settlement is fair, reasonable, and adequate. See Fresco v. Auto. Directions, Inc., No. 03-CIV-61063, 2009 WL 9054828, at *4 (S.D. Fla. Jan. 20, 2009) ("'The second and third considerations of the Bennett test are easily combined.'") (quoting Behrens v. Wometco Enters., Ins., 118 F.R.D. 534, 541 (S.D. Fla. 1988)). Some of the objectors argue that the settlement should have provided for an increased number of points or a refund of maintenance fees, but neither option would be an available remedy at trial. Plaintiffs' points were reduced to conform to the Program requirements based on class members deeded VOIs, and the Association is not permitted to excuse select owners from paying their share of the common expenses. See FLA. STAT. § 721.15(2)(b); Ocean Trail Unit Owners Ass'n, Inc. v. Mead, 650 So. 2d 4, 7 (Fla. 1994). Plaintiffs could have recovered a monetary judgment, but recovery may have been subject to a setoff or reduction based on Plaintiffs' use of excessive points or knowledge that the transactions were invalid. Recovery against BL

would be difficult because it does not have significant assets beyond what it is contributing to the settlement (Doc. 134-4). And, a monetary judgment against the Association would likely be assessed to the VOI owners, including the class members (Doc. 44-1).

The amended complaint seeks rescission of the contracts and obligations arising out of the fraudulent transactions. Rescission is an equitable remedy providing the court with authority to undo the original transaction and restore the former status of the parties. Phillips v. Kaplus, 764 F.2d 807, 812 (11th Cir. 1985); Rubesa v. Bull Run Jumpers, LLC, No. 09-CV-81107, 2010 WL 376320, at *2 (S.D. Fla. Jan. 26, 2010). It is unclear whether any Defendant is able to restore to Plaintiffs the exact VOIs they transferred as part of Celebration's scheme and thus, it is unclear whether the contracts can be rescinded. See Gentry v. Smith, 487 F.2d 571, 578 (5th Cir. 1973) ("It is the well settled law of this State that a party who rescinds an agreement must place the opposite party in status quo, and where restoration is impossible [the] contract cannot be rescinded.") (internal citations omitted).

Considering the likelihood of success on the merits, and the range of possible recovery, and the Settling Defendants' agreement to provide between one and ten vacation weeks based on the number of points reduced, a $10,000 common fund, and the option to deedback Plaintiffs' VOIs, I conclude that the Settlement Agreement is a fair and reasonable resolution of Plaintiffs' claims. Vacation weeks provide class members a benefit similar to what they actually lost, as points are primarily used to reserve vacation time. Some objectors indirectly argue that the number of weeks provided is insufficient to fully compensate them for their lost points, but "[t]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair

or inadequate." Strube v. Am. Equity Inv. Life Ins. Co., 226 F.R.D. 688, 698 (M.D. Fla. 2005). ZHC's agreement to provide a VOI deedback option is a reasonable resolution of Plaintiffs' claims for rescission, especially considering the likelihood of success at trial and the fact that ZHC had no involvement in the fraudulent transactions.[1]  Some objectors argue that they should be entitled to a refund of maintenance fees, but restoring Plaintiffs to their original positions would result in higher maintenance fees for many class members. Although the $10,000 common fund is small compared to the number of claimants and the transactions at issue, the amount is reasonable considering BL's limited involvement in this matter and its limited resources. It is also notable that experienced counsel on both sides of this case recommend that the Court approve the Settlement Agreement as fair, reasonable, and adequate. See Cotton v. Hinton, 559 F.2d 1326, 1330 (5th Cir. 1977). Lastly, Celebration is not a party to the Settlement Agreement.

This case has been pending for nearly three and one half years, of which more than two were consumed by mediation and other settlement negotiations (Docs. 100-33). At the end of this process, there is no indication or suggestion of any fraud or collusion in the settlement. See Moulton v. U.S. Steel Corp., 581 F.3d 344, 351 (6th Cir. 2009) (finding no collusion where the settlement agreement was entered into after four years of complex and contested litigation and the agreement was the product of supervised negotiations).

Although the parties have not engaged in formal discovery, class counsel are satisfied that they have sufficient information to assess the strengths and weaknesses of

_____

[1] Three of the 12 "objections" filed with the Court are merely statements "in support of the 'Sellback' option." (Docs. 148-49, 155). Only two of the three objections were filed with the Court and sent to the Claims Administrator (Doc. 151-1 at 31; Docs. 148-49, 155).

their clients' position. Class counsel has been contacted by or reviewed the relevant documents of well over 100 class members (Doc. 151 at 15). The terms and length of the Settlement Agreement support counsel's representation that they obtained enough informal discovery to understand the terms and conditions of the different points, programs, and VOIs involved, and how a settlement could be achieved within the guidelines established for each (Doc. 152 at 8).

The nature and substance of Plaintiffs' claims are complex, not merely because this is a class action, see Cotton, 559 F.2d at 1331 ("It is common knowledge that class action suits have a well deserved reputation as being most complex."), but because there were few, if any, prior cases with similar fact patterns to assist class counsel to evaluate these claims. Plaintiffs have incurred more than $500,000 in attorneys' fees and costs prosecuting this action, and continued litigation would undoubtedly be lengthy and involve discovery, dispositive motions, and class certification motions which will be extensive and costly. Because timeshare owners must pay their share of common expenses, the duration of this litigation will directly impact those class members who wish to deed back their VOIs. See FLA. STAT. § 721.15(2)(b). These considerations weigh in favor of approving the Settlement Agreement. See Cotton, 559 F.2d at 1331 ("Particularly in class action suits, there is an overriding public interest in favor of settlement.").

In determining whether a class action settlement is fair, reasonable, and adequate, the court must also consider the reaction of absent class members. Bennett, 737 F.2d at 986. Notice was sent to 1,800 class members and 3,591 persons on the VOI Purchaser List (Doc. 151-1, ¶¶ 5-9). The Claims Administrator received 742 claims, 7 requests for exclusion, and 22 objections (Id., ¶¶ 11-14). No state or federal government officials have filed objections. Two of the exclusion requests were from non-class members, and only 6

of the 22 objections complied with the Court's Order that objections be filed by May 30, 2016, with a copy delivered to the Claims Administrator (Docs. 137 at 6; 151-1 at 29, 3; 141-43, 145, 148, 155). Of these objections, two were statements "in support of the 'Sellback' option." (Docs. 148, 155).

The remaining objectors (and most of those whose objections were deficient) are unsatisfied with the benefits provided by the Settlement Agreement. They argue that the settlement does not provide full compensation, the deedback option should also provide a refund of maintenance fees, the common fund is too small, their VOIs are now worth less, and they are entitled to fewer points than prior to upgrading with Celebration. The objectors generally fail to acknowledge that Celebration–the company that fraudulently sold VOIs at the Resort and promised excessive point allocations–is not a party to the Settlement Agreement and Plaintiffs are not releasing any claims against Celebration. The objectors also fail to account for the risks and costs of litigating this controversy, the likelihood of success on the merits, and the likelihood of obtaining the relief they seek. Class counsel represents that much of the relief sought by the objectors would be unavailable at trial and full compensation is not a prerequisite for a fair settlement (Doc. 151 at 14-15). See Borcea v. Carnival Corp., 238 F.R.D. 664, 673 (S.D. Fla. 2006).

The minimal number of objections and exclusions, the substance of the objections, and the high claims rate all support a finding that the Settlement Agreement is fair, reasonable, and adequate. See Figueroa v. Sharper Image Corp., 517 F. Supp. 2d 1292, 1328 (S.D. Fla. 2007) ("While a low percentage of objections points to the reasonableness of a proposed settlement, a high percentage of objections signals that a proposed settlement is not fair or reasonable.") (citing Lipuma v. Am. Express Co., 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005)).

For these reasons, I recommend the Court find that the proposed settlement is fair, reasonable, and adequate and not the product of fraud or collusion between the parties.

## V. Service Awards

The Settlement Agreement provides for each of the six class representatives to receive a service award of $1,000. The awards will be paid by the Settling Defendants (excluding BL) and will not reduce the common fund (Doc. 134-1 at 30-31). Class counsel argues that service awards are appropriate because the case would not have settled absent the contributions from the class representatives (Doc. 152 at 16). The class representatives shared their experiences with class counsel, raised concerns that resulted in a more rounded settlement, and attended (or were on stand-by to attend) mediations (Id. at 15-16). There have been no objections to the requested service awards.

"'Courts routinely approve incentive awards to compensate named plaintiffs for the services they provided and the risks they incurred during the course of the class action litigation.'" Hosier v. Mattress Firm, Inc., No. 3:10-CV-294-J-32JRK, 2012 WL 2813960, at *5 (M.D. Fla. June 8, 2012), report and recommendation adopted, No. 3:10-CV-294-J-32JRK, 2012 WL 2838610 (M.D. Fla. July 10, 2012) (quoting Ingram v. The Coca-Cola Co., 200 F.R.D. 685, 694 (N.D. Ga. 2001)). See also Allapattah Servs., Inc. v. Exxon Corp., 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006). Considering the class representatives' involvement and the results achieved, a $1,000 service award for each is reasonable and will not result in disproportionately greater benefits to the class representatives. See Palmer v. Dynamic Recovery Sols., LLC, No. 6:15-CV-59-ORL-40KRS, 2016 WL 2348704, at *9 (M.D. Fla. May 4, 2016); Allapattah Servs., Inc., 454 F. Supp. 2d at 1219.

## VI. Attorney's Fees and Costs

Class Counsel seeks an award of $420,000 in attorney's fees and costs. The Settling Defendants (excluding BL) have agreed to pay up to that amount to class counsel for fees, costs, and other expenses (Doc. 134-1 at 31). The Settlement Agreement states that "Settling Defendants and Class Counsel did not discuss attorneys' fees, costs, and expenses or incentive awards until after the Parties had reached agreement regarding the substantive terms of the Settlement Agreement." (Id.). In accordance with the terms of the Settlement Agreement, the Settling Defendants have not opposed class counsel's application for fees (Id.).

Courts in this circuit use the lodestar approach to determine reasonable attorney's fees in a class action settlement where, as here, the primary class benefits are not a common fund. Camden I Condo. Ass'n, Inc. v. Dunkle, 946 F.2d 768, 774 (11th Cir. 1991); Norman v. Hous. Auth. of City of Montgomery, 836 F.2d 1292 (11th Cir. 1988). The lodestar is calculated by multiplying the number of hours reasonably expended on the litigation by the customary fee charged in the community for similar legal services. Ass'n of Disabled Ams. v. Neptune Designs, Inc., 469 F.3d 1357, 1359 (11th Cir. 2006) (per curiam); Loranger v. Stierheim, 10 F.3d 776, 781 (11th Cir. 2005) (per curiam); Norman, 836 F.2d at 1299. "[T]here is a 'strong presumption' that the lodestar is the reasonable sum the attorneys deserve." Bivins v. Wrap It Up, Inc., 548 F.3d 1348, 1350 (11th Cir. 2008) (citing Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565-66 (1986)).

"A reasonable hourly rate is the prevailing market rate in the relevant legal community for similar services by lawyers of reasonably comparable skills, experience, and reputation." Norman, 836 F.2d at 1303. The prevailing party bears the burden of

producing evidence of the prevailing market rate, which must "speak to rates actually billed and paid in similar lawsuits," and may include the expert opinions of other attorneys. Id. at 1300. "In determining what is a 'reasonable' hourly rate and what number of compensable hours is 'reasonable' the court is to consider the 12 factors enumerated in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714 (5th Cir. 1974)." Bivins, 548 F.3d at 1350. The Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service properly; (4) the preclusion of other employment due to the attorney's acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Johnson, 488 F.2d at 717-19.

"The fee applicant bears the burden of establishing entitlement and documenting the appropriate hours and hourly rates." Norman, 836 F.2d at 1303. A party may satisfy this burden "by producing either direct evidence of rates charged under similar circumstances, or opinion evidence of reasonable rates." Chemische Fabrik Budenheim KG v. Bavaria Corp Int'l, No. 6:08-cv-1182-Orl-22DAB, 2010 WL 98991, at *4 (M.D. Fla. Jan. 6, 2010). The fee applicant should "supply[] the court with specific and detailed evidence from which the court can determine the reasonable hourly rate." Norman, 836 F.2d at 1303. Evidence of prevailing rates for comparable services can be adduced either through direct evidence of charges by lawyers under similar circumstances or by opinion. Id. at 1299. "[T]he best information available to the court is usually a range of fees set by the market place...." Id. at 1301.

Once the lodestar is determined, the court may adjust it based upon a variety of factors to reach what the court considers to be an appropriate attorney's fee. Neptune Designs, 469 F.3d at 1359. The court can also use its knowledge, expertise, and experience to determine the reasonable and proper fee to award. Chemische, 2010 WL 98991, at *4 (citing Norman, 836 F.2d at 1303); Perez v. Sanford-Orlando Kennel Club, Inc., et al., No. 6:05-cv-269-Orl-28KRS, 2009 WL 2500290, at *2 (M.D. Fla. Aug. 14, 2009) ("It is well established that the Court may use its discretion and expertise to determine the appropriate hourly rate to be applied to an award of attorney's fees."); Loranger, 10 F.3d at 781 (In determining a reasonable hourly rate, "[a] court ... is itself an expert on the question and may consider its own knowledge and experience concerning reasonable and proper fees and may form an independent judgment either with or without the aid of witnesses as to value.") (quotations omitted); Norman, 836 F.2d at 1303 ("The court ... is itself an expert on the question [of attorneys' fees] and may consider its own knowledge and experience concerning reasonable and proper fees.").

Class Counsel submit that as of June 9, 2016, Michael D. Finn, Esq., billed 148.9 hours on this case at an hourly rate of $375 per hour, Shannon L. Zetrouer, Esq., billed 557.8 hours at an hourly rate of $325 per hour, and Tyson Pulsifer, Esq., billed 804 hours at an hourly rate of $300, for a total of $478,322.50 (Doc. 152-1 at 7). Class counsel has provided evidence that the hourly rates billed in this case reflect their normal hourly rates and are commensurate with hourly rates charged by attorneys with similar levels of experience who practice in the area of class action litigation (Id.). At the hearing, class counsel represented that they have now incurred more than $500,000 in fees and costs, and that the average hourly attorney rate is $278. Class counsel have not billed for an unspecified amount of paralegal time or $10,440.73 that was paid to attorney Andrew

Friedman from the law firm of Cohen Milstein (Id. at 7-8). Class counsel also submit that as of June 9, 2016, $5,529.17 in necessary costs and expenses had been incurred for the filing fee, serving Defendants, records requests, and mediation (Id. at 8).

Best practice would have been for class counsel to submit detailed billing records documenting their time and costs expended on this litigation, see Hensley v. Eckerhart, 461 U.S. 424, 437 (1983); Norman, 836 F.2d at 1301-03; PNC Bank, N.A. v. Naborhood Bldg. Prods., LLC, No. 13-0307-WS-B, 2013 WL 5587890, at *3 (S.D. Ala. Oct. 10, 2013). Still, what is most telling is that the Settling Defendants have not objected to the amount sought. Based upon my knowledge of the case, and of the performance and pricing of legal work generally, I am satisfied that the number of hours claimed and class counsel's hourly rates are reasonable. See e.g., Holman v. Student Loan Xpress, Inc., 778 F. Supp. 2d 1306, 1312 (M.D. Fla. 2011); N. Star Capital Acquisitions, LLC v. Krig, No. 3:07-CV-264-J-32MCR, 2011 WL 65662, at *6 (M.D. Fla. Jan. 10, 2011). Two objectors did argue that the amount of attorney's fees is disproportional to the amount of the benefit or common fund. "Attorneys get $420,000 dollars and we get nothing!" (Doc. 147). "I don't agree that 'Class Counsel' should be entitled for up to $420,000.00 when the Members are to have the sum of only $10,000 to be distributed between all other Settlement Class Members." (Doc. 150). Neither objection complied with the requirements for filing objections (Docs. 137, 151-1 at 31). And, neither objection takes into account the benefits of the vacation weeks or deedback option, the value of which far exceed that of the common fund.

Class counsel undertook this litigation on a contingent fee basis and devoted substantial time and energy to the case despite the risk of not being paid. Although class counsel often litigates cases involving timeshares, the risks of nonpayment in this case

was significant. Class counsel devoted more than 1,500 hours to the case without any guarantee of receiving payment. Class counsel took on this case to the preclusion of other employment, despite the novelty and difficulty of the issues and a lack of cases with similar fact patterns, and only after unsuccessfully attempting to have other firms take the case. Considering these factors, as well as the relief obtained for the class, the complexity and duration of the litigation, and the skill of counsel for both sides, all discussed *supra*, I recommend the Court find that an award of attorneys' fees and costs in the amount of $420,000 is reasonable.

## VII. Recommendation

For the foregoing reasons, I respectfully recommend that the Court:

(1) **FIND** that Plaintiffs have met their burden of showing that the prerequisites for the certification of a class action pursuant to Rules 23(a) and 23(b)(3) have been satisfied;

(2) **FIND** that the Settlement Agreement is fair, reasonable, and adequate;

(3) **FIND** that class counsel's requested award of fees and expenses is fair and reasonable;

(4) **GRANT** the Class Representatives' Motion for Final Approval of the Class Action Settlement (Doc. 151);

(5) **GRANT** Plaintiffs' Motion for Attorneys' Fees, Costs, and Service Awards (Doc. 152);

(6) **APPROVE** the Settlement Agreement as being fair, reasonable, adequate, and in the best interest of the class;

(7) **CERTIFY** the Class for settlement purposes;

(8) **AWARD** class counsel $420,000 in attorney's fees and costs, to be paid

pursuant to the terms of the Settlement Agreement;

(9) **AWARD** each class representatives a $1,000 service fee as specified in the Settlement Agreement;

(10) **DIRECT** the Clerk to **TERMINATE** all pending motions; and

(11) **DISMISS** this case with prejudice.

## VIII. Notice to Parties

A party has fourteen days from this date to file written objections to this Report and Recommendation's factual findings and legal conclusions. A party's failure to file written objections waives that party's right to challenge on appeal any unobjected-to factual finding or legal conclusion the district judge adopts from the Report and Recommendation. <u>See</u> 11th Cir. R. 3-1.

**RESPECTFULLY RECOMMENDED** at Orlando, Florida on August 1, 2016.

THOMAS B. SMITH
United States Magistrate Judge

Copies furnished to:

Presiding United States District Judge
Counsel of Record